**WELDED TUBE COMPANY OF AMERICA, Plaintiff,**

v.

**PHOENIX STEEL CORPORATION, Defendant.**

Civ. A. No. 69-2493.

United States District Court,
E. D. Pennsylvania.

April 16, 1974.

Perry S. Bechtle, Philadelphia, Pa., for plaintiff.

Morris R. Brooke, Philadelphia, Pa., for defendant.

## ADJUDICATION

DITTER, District Judge.

This case, which grows out of a requirements contract to manufacture steel tubing, presents questions concerning the validity of an artisan's common law lien, the basis for the computation of that lien, and the legality of a purported sale to enforce the lien. After considering the evidence, I make the following:

## FINDINGS OF FACT

1. In September, 1965, Welded Tube Company of America and Phoenix Steel Corporation entered into an agreement under the terms of which Phoenix agreed to provide, at Welded's plant, steel coils suitable for conversion into structural steel tubing, and Welded agreed to fabricate from these coils such structural steel tubing as Phoenix might require for sale to its customers. The agreement of the parties is contained in letters dated September 20, 1965 and September 29, 1965, and signed by their representatives.

2. The agreement contained a schedule of charges for the work to be performed by Welded in fabricating structural steel tubing upon Phoenix's order. These charges varied from $30. to $60. per ton of finished tubing depending upon the volume fabricated and shipped for Phoenix each month.

3. Under the terms of the agreement the basis upon which Phoenix was to pay Welded for fabricating the structural steel was "30 days net"; that is, Phoenix was required to pay Welded 30 days after the work had been completed and an invoice therefor rendered to Phoenix. Subsequently, the parties modified their agreement to provide that invoices rendered from the 1st to the 10th of the month would be payable on the 30th; invoices rendered from the 11th to the 20th of the month would be payable on the 10th of the following month; and invoices rendered on the 21st to the 31st of the month would be payable on the 20th of the following month.

4. Phoenix purchased and caused to be delivered to Welded in accordance with the agreement substantial tonnages of steel coils of $\frac{1}{4}$ inch, $\frac{5}{16}$ inch and $\frac{3}{8}$ inch gauges. Phoenix issued to Welded from time to time thereafter, instructions to fabricate from these coils a designated quantity of structural steel tubing of specified dimensions. Phoenix's orders were scheduled so that production for Phoenix would coincide with Welded's regular production of similar sizes for its own use.

5. In July, 1968, Phoenix notified Welded that Phoenix was going out of the structural steel tubing business and would not have further steel coils delivered to Welded. As of that time, a substantial tonnage of steel coils belonging to Phoenix were located at Welded's plant.

6. In August, 1968, a meeting was held between representatives of the parties at which Phoenix confirmed its decision to go out of the tubing business and its intention to liquidate its inventory of steel coils. Phoenix advised Welded that it might do so by selling the steel as such or by instructing Welded to

fabricate structural steel tubing from these coils in accordance with the agreement.

7. Welded offered to purchase the coils from Phoenix as coils but offered a price at which Phoenix was unwilling to sell them.

8. Thereafter, Phoenix instructed Welded to fabricate additional structural steel tubing in accordance with the agreement and Welded did so utilizing the steel coils located at its plant.

9. As of June, 1969, there were 2,655½ tons of steel coils, belonging to Phoenix, remaining at Welded's plant: 1,138½ tons were whole coils on which no work had been performed by Welded, and 1,517 tons were portions of coils ("slit coils") remaining after Welded had fabricated structural steel tubing, at Phoenix's request, out of a part of these coils.

10. On June 30, 1969, Phoenix demanded that Welded give Phoenix possession of the coils. Welded refused, and thereafter Welded continuously refused to give Phoenix possession of the coils asserting a lien thereon.

11. As of June 30, 1969, there were no outstanding invoices, rendered by Welded to Phoenix for charges in connection with the fabrication by Welded of structural steel tubing, which had not been paid by Phoenix in accordance with the agreement between the parties.

12. A number of generalized claims, not specific in nature or amount (including claims not pressed by Welded in this action), were made by Welded on June 30, 1969 and thereafter as a purported basis for Welded's refusal to deliver possession of the coils to Phoenix. No notice setting forth the precise nature of Welded's claims, or the specific amount thereof, was rendered to Phoenix by Welded until the filing of the complaint in this action on October 23, 1969.

13. The 2,655½ tons of Phoenix's coils, whole and slit, which Welded had in its possession on June 30, 1969, were prime hotrolled steel coils of ¼" gauge and larger of Japanese manufacture.

As of June 30, 1969, there was no deterioration in the coils which impaired their value for use in the fabrication of structural steel products, nor did any such deterioration occur subsequent to June 30, 1969.

14. On June 30, 1969, the published price for prime hotrolled steel coils, ¼" gauge and larger, of domestic manufacture was $128. per ton. In August, 1969, the published price was increased to $130. per ton. In February, 1970, the published price went to $134. per ton. In June, 1970, it rose to $141. per ton, and in November, 1970, to $147. per ton. Throughout this period the price of prime, hotrolled steel coils, ¼" gauge and larger, of foreign manufacture was $25. per ton below the published domestic price.

15. The fair market value of the 2,655½ tons of coils which Welded held was $103. per ton on June 30, 1969.

16. In August, 1969, Ryerson Steel Company offered to purchase the coils from Phoenix for $104. per ton.

17. On September 3, 1969, Phoenix notified Welded that Phoenix had received a specific offer for the coils and, once again, demanded their release. At the same time, Phoenix agreed to reimburse Welded a reasonable amount for any work which had been done on the slit coils. Welded did not respond but, as stated in Finding No. 10 above, continued to refuse to give Phoenix possession of any of the coils.

18. On September 26, 1969, attorneys for Phoenix wrote to the attorneys for Welded stating that Phoenix agreed to pay $50,000. for the work on the slit coils for which Welded claimed reimbursement. This offer was not accepted.

19. Due to Welded's continued detention of the coils, Phoenix was unable to consummate the sale of the steel to Ryerson Steel Company for $104. per ton.

20. On October 23, 1969, Welded filed a complaint in this action claiming a lien on the steel coils belonging to

Phoenix which were in Welded's possession based upon the following items of alleged indebtedness: (a) in the amount of $51,013.08 upon invoices rendered to Phoenix in July, 1969, and thereafter for finished tubing; (b) in the amount of $75,271.94 for the work Welded performed upon the partly-used coils; and (c) in the amount of $20,163. for "storage and handling charges" in connection with the 1,138½ tons of whole coils in its possession.

21. Phoenix filed an answer to the complaint asserting by way of counterclaim that Welded had wrongfully detained 2,655½ tons of steel coils, having a value of $273,000., which were Phoenix's property and demanding damages in that amount plus interest.

22. Phoenix admits that it owes Welded $51,013.08. for finished tubing as set forth in invoices rendered to Phoenix by Welded and dated subsequent to June 30, 1969. In September, 1969, Phoenix expressly agreed to pay these invoices, provided that Welded would deliver to Phoenix the 2,655½ tons of steel coils which were Phoenix's property.

23. Negotiations between the attorneys for Phoenix and Welded following the commencement of this action failed to produce any agreement.

24. On August 25, 1970, Welded notified Phoenix of its intention, notwithstanding the pendency of this action and Phoenix's counterclaim therein, to sell the steel coils which were Phoenix's property in accordance with provisions of Pennsylvania law, the Act of May 7, 1925, P.L. 557, § 1, 6 P.S. § 11. Notices advertising the sale of the coils were placed by Welded in one issue of the New York Times, two issues of the Baltimore Sun, two issues of the Philadelphia Bulletin and in two issues of the Legal Intelligencer. Notice of the sale was posted at Welded's premises and upon two street corners in Philadelphia. There was no evidence as to the number of handbills posted. On November 23, 1970, a purported "public sale" was held by Welded on its premises at Shunk and Vandalia Streets, Philadelphia. Welded was the only bidder.

25. There are no major manufacturers of structural steel products east of Pittsburgh which would have been potential purchasers of the Phoenix coils, except Welded. In order to obtain buyers for these coils, it would have been necessary to reach potential purchasers, most of whom are located in the midwest, through direct solicitation or by advertising in the daily trade newspaper, "American Metal Market," or in the bi-monthly trade magazine, "Iron Age." A competent steel broker would have had a list of potential purchasers and the ability to communicate with them. Neither Welded nor its auctioneer, Samuel T. Freeman & Co., took any of these steps to obtain buyers for the coils.

26. At the purported "public sale" on November 23, 1970, Welded purchased the whole coils for $70. per ton and the slit coils for $40. per ton, a total purchase price of $140,368.31 and an average of $52.86 per ton.

27. Welded subsequently manufactured structural steel tubing out of both the whole coils and the slit coils.

28. The fabrication of finished structural steel tubing from steel coils entails unrolling, cleaning ("shot blasting"), and cutting. Under Welded's methods of manufacturing, it was most economical to unroll, shot blast, and oil an entire coil of steel, even though not all of it would be processed immediately into tubing. Since Phoenix had issued no orders applicable to the inventory of 1,517 tons of slit coils (i. e., those portions that had been partially processed) Welded had not performed the rolling, forming, welding and cutting operations necessary to convert them into tubing.

29. As stated in Finding No. 2, supra, the agreement between the parties fixed the charges to be made by Welded for fabricating the coils into finished tubing at from $30. to $60. per ton depending upon the quantity of tubing fabricated by Welded each month. No

credible evidence was introduced to apportion to the contract prices the various steps in the manufacturing process or to take into account the volume of tubing being fabricated in 1967, 1968, and 1969 when the partial processing took place.

30. Welded's lien claim for partially finished work purports to be based upon a proration of Welded's production costs. It is clear, however, that these "costs" are completely unrelated to the performance of work for Phoenix.

31. There is no credible evidence to support an award, as claimed in the complaint, to Welded of $50.62 per ton for work performed by it on the slit coils, or for any other amount.

32. Welded itself got the benefit of the work performed upon split coils when Welded purchased and fabricated them into tubing. Whatever "costs" Welded incurred in performing this work during 1967, 1968 and 1969, it saved in 1970 and 1971 by being able to fabricate the slit coils into finished tubing for its own account without having to shot blast, slit and oil them.

33. Welded's lien claim of $20,163. for the storage and handling of Phoenix's steel is based upon standard charges in the steel industry, not upon any provision in the contract, not upon any apportionment to the contract prices, and not upon any proportionate part of Welded's costs.

34. The agreement between the parties does not provide for the payment by Phoenix to Welded of any separate charges for "storage" or "handling" of steel coils.

## DISCUSSION

This diversity action arises from a dispute growing out of the termination of a contract between the parties. In 1965, it was agreed that Phoenix would cause to be delivered to Welded's manufacturing facilities rolls of steel plate (coils) which Welded would then convert into steel tubing upon Phoenix's written order. In July, 1968, Phoenix notified Welded that Phoenix was going to discontinue the steel tubing business and would therefore not ship additional steel coils to Welded's plant. At that time, however, there was a substantial amount of Phoenix's steel at Welded's facility. During the ensuing year, Welded continued to manufacture steel tubing from these supplies for Phoenix.

On June 30, 1969, Phoenix demanded that Welded give Phoenix possession of the remaining steel coils, but Welded refused to do so. Welded maintains that it had a lien on this steel for unpaid invoices, storage and handling, and the performance of partial fabrication work. When Phoenix refused to pay the amounts Welded claimed, Welded had a public sale conducted at which it was the purchaser of the steel in question. Welded asserts that despite the proceeds of the sale, there is still money due to it for its work under the contract. Phoenix contends that Welded converted the steel because there was no lien, no right to retain possession, and that in any event, Welded breached a duty of good faith in the way the sale was conducted.

The basic agreement between the parties was a requirements contract. Simply stated, Welded was obligated to fabricate such quantities of tubing as Phoenix directed and Phoenix was obligated to pay for the finished products at certain agreed prices.

Under the law in Pennsylvania, which governs this case, it is well established that a requirements contract does not impose upon a buyer the necessity to order that any work be done. The buyer has no duty to have a requirement. Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corporation, 130 F.2d 471, 473 (3rd Cir. 1942). The seller assumes the risk of all good faith variations in the buyer's requirements, even to the extent of a determination to discontinue the business. HML Corporation v. General Foods Corporation, 365 F.2d 77, 81 (3rd Cir. 1966). Thus, Phoenix did not breach the contract when it decided to withdraw from the tubing business and

Welded's only rights are those it had by the terms of the contract.

 Welded's assertion that on June 30, 1969, it had a valid lien on Phoenix's steel consists of three separate claims: one for completed work for which no payment had been received, one for storage and handling charges, and one for partial processing of a portion of Phoenix's inventory. The right to a specific lien on property in the hands of an artisan for the price of work done to it at the owner's request is of common law origin based on immemorial custom. In the absence of anything in the contract inconsistent therewith, this right has long been extended to every bailee who has conferred some value on the object in question by his labor or skill. 8 C.J.S. Bailments § 35a, at 435 (1962) and 8 Am.Jur.2d Bailments § 230 (1963). The declared policy of Pennsylvania, however, is generally to restrict the tying-up of personal property by liens. The commercial customs of the day are founded on a credit system that would come to a standstill if liens by bailees were encouraged. A lien claim cannot be sustained unless it is established by common law, statute, or an express agreement between the parties. If an asserted lien falls within none of those classes, it must be refused: Mitchell v. Standard Repair Co., 275 Pa. 328, 332, 119 A. 410 (1923).

Such is the case here. Welded had no right to a lien under any of its theories.

I. Welded's claim for a lien is inconsistent with its agreement to extend credit to Phoenix.

The contract between the parties states that payment by Phoenix for Welded's work is to be made 30 days after completion and the rendering of an invoice to Phoenix. Subsequently, the parties modified this provision of the contract—but, in any event, Phoenix had 20 days within which to make payment after the submission of an invoice. It was agreed by the parties that as of June 30, 1969, there were no unpaid invoices. Hence, there was no money due by Phoenix to Welded despite the fact that invoices were subsequently rendered for work already performed. Welded's withholding of the steel belonging to Phoenix was only valid if there was money due to Welded on June 30, 1969. In re Hamburger Distillery, 115 F.2d 84, 86 (3rd Cir. 1940). Under the terms of the contract there was nothing due on that date.

The same is true so far as Welded's claims for handling, storage, and partial work are concerned. Welded had agreed to extend credit to Phoenix. Even though Welded had known for a year that Phoenix was terminating its requirements, as of June 30, 1969, there were no invoices from Welded for handling & storage, or incompleted processing.[1] Phoenix's decision that it would have no further need for tubing did not transform a 20 day credit arrangement into one for cash as a condition to obtain the return of Phoenix's raw materials and the delivery of the partially finished products.

 Welded's claim for a lien cannot be sustained because a contract extending credit is inconsistent with, and a waiver of, a lien arising out of a bailment. Mathias v. Sellers, 86 Pa. 486, 491 (1878); Carbon Silk Mills Co. v. Powell, 108 F.2d 474 (3rd Cir. 1939); cert. denied, 310 U.S. 625, 60 S.Ct. 896, 84 L.Ed. 1396 (1940); 8 Am.Jur.2d Bailment's § 235 (1963); 8 C.J.S. Bailments § 35a, at 439 (1962).

II. Welded's claim for handling and storage.

Even if Welded had not waived its right to a lien by agreeing to extend credit to Phoenix, further analysis of Welded's claims only demonstrates their fallacies, contradictions, and legal inconsistencies.

For example, in an attempt to prove it had a lien for the handling and storage

1. In fact the first definite statement of Welded's claim for these charges was contained in the complaint which began this action and which was filed October 23, 1969.

of Phoenix's steel, Welded presented the testimony of its president, Louis Bailis, and that of Irving E. Weinstein, the president of Corell Steel Company, a processor of steel products in Philadelphia. Mr. Weinstein was asked what the reasonable cost of handling steel would have been in 1970. He replied, "We get into more or less a standard on that and the standard we refer to is 1 and 1 and 1, which means a dollar for the initial unloading into the plant or into a warehouse, a dollar a month storage and then a dollar a ton when it goes out." (N.T. 12) Mr. Bailis testified that on a single occasion, not in the Philadelphia area, his company had been charged in excess of these prices.

Plaintiff does not contend that there is any provision in the contract allowing a charge or lien for storage or handling, or that there was any oral agreement to this effect.[2] There was no evidence of any business custom or other circumstance from which an agreement for a lien could be implied. Rather, it is plaintiff's theory that because a warehouseman may assert a lien for storage charges, Welded may do so.

■ In Pennsylvania, a warehouseman does have a common law lien for storage charges, but a warehouseman is one who carries on the business of receiving and keeping goods in storage for compensation. Welded was not in the storage business,[3] nor did it show that storage for hire was incidental to its regular business. Since a lien upon goods for storage charges extends only to those persons engaged in the business of public warehousing, Mitchell v. Standard Repair Co., supra, 275 Pa. at 331, 119 A. 410, Welded's claim for a storage lien must be dismissed.

■ Welded's contention that it is entitled to a lien for handling the steel is also without merit. There was no attempt to allocate part of the contract prices to the handling of Phoenix's steel, to demonstrate what expenses Welded may have incurred by reason of this particular work, or to show Welded had ever made charges of this type before. Welded's evidence was insufficient to establish any right to be paid for this service under the circumstances of this case.

■ Secondly, the purported lien of one dollar per ton for loading the steel for shipment from Welded's plant is inconsistent under plaintiff's own theory. If it be assumed that Welded's "sale" placed title in Welded, there would be no liability on the part of Phoenix for Welded's expenses in handling its own property. On the other hand, if the sale was invalid and did not pass title to Welded, the loading and shipping services performed by Welded were a part of its own wrongful act in failing to turn the steel over to Phoenix, the rightful owner.

III. Welded's claim for shot blasting, oiling, and slitting.

Welded's third portion of its lien claim refers to work done in preparing Phoenix's raw steel for fabrication.

Coils of steel come in varying widths and are of various gauges. For example, a specific coil might be .25 inches thick, 47.55 inches wide, and weigh 15 tons. From this coil Phoenix may have desired to have a piece 24 inches in width cut for the forming of a six inch square tube. For economic reasons, the entire coil would be unrolled and then processed for the removal of surface imperfections and rust. This is accomplished by "shot blasting," that is, the subjecting of the steel to pounding from small metal particles about the size of BB's. The steel is then oiled, after

---

2. Welded contended that Phoenix was obligated to have processed whatever steel was sent to Welded. (N.T. 147). Nothing in the contract supports this position. In all probability neither party considered what would happen to materials remaining on hand at the end of the contract, and I cannot insert a provision which the parties might have drafted had these particular circumstances occurred to them.

3. Welded's president said, "We are not storage agents . . . I am not a warehouseman." (N.T. 190).

which it is slit so the necessary piece can be converted to tubing. The remainder is stored for future use. Welded claims a lien of $104,205.26 for 1517 tons of steel which were shot blasted and oiled, but on which no further work was done.

To justify this amount, Louis Bailis, the president of Welded, produced records to show that in 1967 the per ton cost of finished tubing was $59.11 and that for 1968 and 1969 it was $67.60 and $94.24, respectively. He attributed 85% of the cost of production to shot blasting, oiling, and slitting, that is $50.24, $57.46, and $80.10 per ton respectively for the three years in question. These prices were then applied to the steel worked for those years, but not completed, and thus the total of $104,205.26 was reached.[4]

■ Welded has no right to a lien for this work because there was no showing that it was done *at the request* of Phoenix. See Restatement of Security § 61(a). While Phoenix undoubtedly acquiesced to Welded's shot blasting and oiling of an entire steel coil although only a part of it was to be used at that point, this method was employed so that Welded's cost would be reduced. From the standpoint of Phoenix, it was entitled to finished tubing at prices between $30. and $60. per ton and Phoenix was no more responsible for the step by step production methods employed by Welded than was Welded concerned with the terms on which Phoenix would sell the finished product.

■ There is a second reason why Welded is not entitled to be paid for this work and thus has no valid lien in connection with it: Welded purchased the material at its "public sale" and therefore when Welded ultimately manufactured the steel into tubing, Welded got the benefit[5] of whatever work had been done.

■ Assuming, however, that Welded did have a right to a lien for this work, Welded's claim is based on figures which purport to represent its production costs. Although an artisan may assert a lien based on an agreed price or on the value conferred upon an article by his services, I have been able to find no authority, and none has been cited to me, which allows a lien to be asserted on the basis of the artisan's costs of doing business.

Welded's president testified it did not expect to make any profit from its arrangement with Phoenix. (N.T. 132) However, the advantage to Welded would be to increase its volume and thus reduce Welded's unit costs. (N.T. 122) It was agreed that anything to be produced for Phoenix would be made at the same time that Welded was making that same item for itself. (N.T. 131, 132) This meant there would be an increase in Welded's profit from the sale of its own goods.

Mr. Bailis explained it in this way:

"Well, if we were producing a thousand tons, we were set up to produce a thousand tons of a given item for ourselves, it takes X-number of hours to make your set ups all the way down the line. It takes a certain poundage of scrap that is going to hit in getting what we call a good tube. Now, if you can increase that run by whatever percentage you can, to that

---

4. From 1967, 202 tons x $50.24, $10,148.48; from 1968, 498 tons x $57.46, $28,615.08; and from 1969, 817 tons x $80.10, $65,441.-70. See Post-trial brief of plaintiff, Welded Tube Company of America, p. 26. Paragraph 14 of the Complaint, on the other hand, alleges the fair and reasonable value of this work was $50.62 per ton, that there were 1517 tons of partially converted steel, and that the value of Welded's services were thus $75,271.94. The variance is considerable and does not lend weight to the overall credibility of plaintiff's witnesses or their computations.

5. Welded argues that the steel was not enhanced but reduced in value by reason of this work. If that be true it raises the question of whether there could be a lien at all. Many authorities suggest a lien is only available to an artisan who has increased the value of the bailed item. See, for example, 8 C.J.S. Bailments § 35a, at 438 (1962), 8 Am.Jur.2d Bailment § 229 (1963).

degree you have reduced your cost factor because if you run longer, the charge for the change over time requirement is spread over a greater number of units. The scrap generated, which we call set up scrap, is divided over a greater number of units. Therefore, your percentage is dropped and it relates to cost." (N.T. 132–133)

The first fallacy in the way Welded related its lien claim to specific dollars for the partial processing of Phoenix's steel was in Welded's use of an average, annual per ton cost. In reality, Welded seeks to impose upon Phoenix costs that would have been incurred whether or not any work was done for Phoenix. Welded only made a specific size tubing of a certain gauge for Phoenix when it was producing that same type of tubing for itself. Thus, the set up costs would have been incurred in any event and the costs to produce the steel for Phoenix may have been minimal or nonexistent. In 1967, for example, there were 5109 tons of tubing produced for Phoenix, an average of less than 100 tons per week. In referring to 4960 tons produced in 1966 for Bethlehem Steel Company under a similar contract, Mr. Bailis explained:

"Again, if you make, if we round it off for purposes of discussion at 5,000 tons you can quickly see that it would [come] out to a little less than 100 tons a week because again these are average figures. And in so doing it will cost you no more or no less whether you produce 100 tons more a week or you didn't. Your people are there. You are changing over, going on just the same, and this is considered a freeby." (N.T. 162)

Despite the fact that Mr. Bailis stated that 5,000 tons of tubing could be produced in its entirety without increasing Welded's costs, Welded asserts a lien in the sum of $10,148.48 for part of that work, based on Welded's total costs for the year. In effect, Welded is trying to rewrite the contract and make Phoenix an equal partner to share in all production expenses (N.T. 220), including those which resulted from business fluctuations, strikes, increased prices (N.T. 164, 166), production difficulties (N.T. 157–158), and overhead (N.T. 211).

The second obvious fallacy in Welded's computations is that there was no testimony that each production run for Welded's own account also was accompanied by a parallel run for Phoenix. Thus, Welded is seeking to impose a charge upon Phoenix for part of the costs to manufacture Welded's own tubing when manufacturing for Phoenix was not even involved.

Not only is it fallacious for Welded to base this portion of its claim on Welded's costs, but to do so amounts to Welded's seeking to be paid twice for the same work.

This can best be illustrated by a simple example. Suppose that in all of 1967, the only work done for Phoenix was on one coil of steel, weighing ten tons. This roll was subjected to shot blasting, oiling, and slitting into two pieces, each 24 inches wide. One of these pieces was then fashioned into tubing, shipped, and paid for. If Welded's per ton cost for all tubing produced that year was $100., since Welded contends that 85% of its costs are attributable to shot blasting, oiling, and slitting, it would follow that an expense of $850. was incurred to shot blast, oil, and slit the *entire* steel coil.[6] However, Welded's position is that it has a valid lien on the remaining half of the coil for that same $850.

The specious nature of Welded's charge can be demonstrated in another way. The lien claimed for shot blasting, oiling, and slitting amounts to $104,205.-26 covering 1517 tons of steel. If Welded had converted every last pound of this steel into finished tubing, the maximum which Welded could have charged Phoenix would have been $60. a ton, a total of $91,020. Thus, for doing what it says was 85 percent of the work,

---

6. It costs no more to shot blast a wide piece of steel than a narrow one. (N.T. 144).

Welded contends it should receive 114 percent of the maximum contract price.

Welded has no right to a lien for the partial work that it did, but even, if there had been such a lien, Welded has not established any basis in the terms of dollars to support it.

IV. Welded's "sale."

When Phoenix refused to pay Welded's claims, Welded engaged a Philadelphia auctioneer, Samuel T. Freeman & Co., to sell Phoenix's steel. Freeman advertised the sale in newspapers of general circulation, posted handbills, and gave Phoenix notice that the steel would be sold in accordance with provisions of Pennsylvania law, the Act of May 7, 1925, P.L. 557, § 1, 6 P.S. § 11.

This was the first occasion in which Freeman had ever dealt with steel of this type. As a result of the public notices given, there were eight requests for additional information (defendant's exhibit No. 17) but at the sale, which was held on November 23, 1970, there were no bidders other than Welded. Welded "bought" the steel, 2,655½ tons, for $140,368.31, an average of $52.86 per ton. At this time, the published price for domestic steel was $147. and for steel of foreign manufacture, $122. The steel in question fell into this latter category.

■ It is implicit that when the goods of another are seized and sold to satisfy a claim, there must be a good faith effort to obtain the best possible price for the items in question. The whole purpose in having a public sale is to protect the owner whose property is being disposed of. Here, Welded breached that duty.

■ ■ While the sale had the trappings of being advertised to attract potential bidders, it was managed in such a way that the reverse was accomplished. There are two publications which serve the steel industry, a daily paper and a bi-monthly trade magazine. This sale was not advertised in either. A local auction firm, which had never sold steel coils before, was engaged. Freeman had no list of potential purchasers of the type which a competent steel broker would normally use—and made no attempt to obtain such a list. Within the primary circulation areas of the newspapers which carried the advertising, Philadelphia, Baltimore, and New York, there were no buyers for steel of this kind. As Welded's witness pointed out, it would be necessary to go at least to the Pittsburgh area and then west to make a sale. (N.T. 34–35) Except for mills that produced steel of the type in question, in the Philadelphia region only Welded had the facilities to handle and process this particular material. (N.T. 10, 31) The results were what might have been expected—no competitive bidders, and a sale to Welded for a price that did not cover Welded's purported lien. The conclusion is inescapable: the sale was a sham, contrived to put legal title for the steel in Welded at the cheapest possible price.

As if all this were not enough, the sale was conducted under the wrong statute.[7] The Act of May 7, 1925, P.L. 557, Section 1, 6 P.S. § 11, authorizes liens and their enforcement by sale when there has been a failure to pay for the repair of personal property. Welded should have proceeded under the Act of December 14, 1863, P.L. (1864) 1127, Section 1, as amended, 6 P.S. § 15. The difference is important. The latter act requires advertisement by newspaper, but also by the posting of six handbills in the most public and conspicuous places in the vicinity. Since those statutes which give bailees the right to sell liened articles are in derogation of the common law, they must be strictly construed. Here there was no evidence that

7. At common law, an artisan's lien represented nothing more than the right to retain possession of the goods until the charge made in connection with them was paid. There was no right of sale. Smyth v. Fidelity and Deposit Co. of Maryland, 125 Pa.Super. 597, 604, 190 A. 398 (1937).

the requisite number of handbills had been posted.

For both substantive and procedural reasons, the purported sale was invalid.

V. Summary.

 Welded's retention of Phoenix's steel constituted a conversion since Welded did not have a valid lien. In addition, Welded has failed to establish any right to damages for handling, storage, or partial manufacturing. Therefore, Phoenix is entitled to the value of its property, $273,516, plus interest from June 30, 1969, the date its return was demanded, less $51,013.08, the amount of Phoenix's unpaid invoices to Welded. Welded is not entitled to interest because Phoenix offered to pay its debt to Welded as one of the conditions for the release of its steel, an offer which Welded was not justified in refusing.

Based upon the foregoing Findings of Fact and for the reasons set forth herein, I reach the following:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. § 1332.

2. Pennsylvania law applies.

3. The contract between the parties, as contained in letters dated September 20, 1965, and September 29, 1965, was terminated and not breached.

4. The sum of $51,013.08 admitted by Phoenix to be due Welded on invoices rendered in July, 1969, by Welded for finished tubing did not become due and payable under the agreement between the parties until 30 days thereafter, and formed no basis for a valid lien, or for the refusal to deliver possession of the coils to Phoenix on June 30, 1969.

5. The term in the agreement between the parties providing for the payment by Phoenix after Welded's work has been completed and an invoice rendered, amounts to a prior contractual waiver by Welded of any possessory lien.

6. Welded's claim for an unspecified sum alleged to be due from Phoenix for work performed by Welded on the 1,517 tons of slit coils, or for storage and handling of the whole coils forms no basis for a valid lien, or for the refusal to deliver possession of the coils to Phoenix, on June 30, 1969.

7. Welded did not establish a valid claim for handling and storage of whole coils. Welded impliedly undertook the handling and storage of whole coils as an incidental obligation in the performance of the agreement, and the agreement neither contemplated nor provided for any charges therefor.

8. Welded did not establish any right to recover for shot blasting, oiling and slitting, or for any other work, in the partial processing of the 1,517 tons of Phoenix's slit coils.

9. On June 30, 1969, and thereafter, Welded wrongfully detained 2,655½ tons of steel coils belonging to Phoenix.

10. In the conduct of the sale, November 23, 1970, Welded failed to take reasonable steps to protect Phoenix's property interests. The sale was invalid because Welded had no lien, breached its duty of good faith, and failed to follow the applicable statutory provisions.

11. Welded's purported purchase of Phoenix's steel on November 23, 1970, was invalid.

12. Phoenix is entitled to recover the value of its steel computed at $103. per ton, $273,516., less the amount due Welded for finished goods, $51,013.08, plus interest, $77,356.79, a total of $299,859.71.