**WELDED TUBE COMPANY OF AMERICA, Appellant,**

v.

**PHOENIX STEEL CORPORATION.**

No. 74–1612.

United States Court of Appeals, Third Circuit.

Argued Feb. 6, 1975.

Decided March 13, 1975.

Perry S. Bechtle, Harold Greenberg, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellant.

Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for appellee.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The Pennsylvania law on artisans' liens is the principal subject of this appeal. Our review of the law as applied by the district court does not disclose error but a remand is required for limited findings on subsidiary issues.

The parties to this diversity suit entered into a "requirements contract" in 1965, the terms of which were embodied in an exchange of letters. The agreement provided that the Welded Tube Company was to fabricate structural tubing from steel coils which had been delivered to its Philadelphia plant by the Phoenix Steel Corporation. That company agreed to pay a certain scheduled amount for the tubing which it ordered as needed, the price dependent upon the quantity required each month. Payment was to be made by Phoenix within twenty to thirty days from the date on which Welded submitted the invoices. Welded had a similar arrangement with another steel company and also purchased steel on its own account for fabrication into tubing.

After some years of doing business according to the terms of this contract, Phoenix notified Welded in July, 1968 that it did not plan to continue in the tubing field and that it intended to conclude the arrangement between them. It offered Welded the opportunity to buy the steel on hand, but the parties were unable to agree upon a price. Phoenix continued to place orders for tubing until June 30, 1969, when it terminated the contract.

On June 30, 1969, there were no outstanding invoices for amounts owed to Welded, although some completed work had not yet been billed. Invoices for that material were duly prepared in the next few weeks and totaled $51,013.08.[1] Phoenix admits that it owes this amount and has offered to pay it.

Welded claimed that, in addition to the foregoing amount, it was entitled to substantial sums for the preliminary work which had been performed on the coils in its possession, and it refused to turn over the steel on hand to Phoenix. In August of 1969, Phoenix received an offer of $104 per ton for the quantity of steel remaining at the Welded plant but was unable to complete the sale because of Welded's refusal to yield possession.

On October 23, 1969, Welded filed the present suit, claiming (1) $51,013.08 for finished tubing, (2) $75,271.94 for preliminary work on partly used coils, and (3) $20,163.00 for storage and handling of the coils upon which no work had been performed. After efforts to settle the controversy failed, Welded advised that it proposed to dispose of this steel at a "public sale"[2] on November 23, 1970. Welded was the only bidder and bought the steel at an average price of $52.86 per ton. It later manufactured structural tubing from that material.

After the nonjury trial, the district judge made findings that:

1. Welded was not entitled to an artisan's lien;

2. Welded had wrongfully withheld possession of the steel from Phoenix;

3. the fair market value of the steel on June 30, 1969 was $103 per ton;

4. Welded had not proved a loss for the preliminary work performed on the coils;

5. Welded was not entitled under the contract to charge for storage; and

6. Phoenix was entitled to recover for the value of the steel at $103 per ton—the sum of $273,516—less the admitted amount due Welded for work on the finished goods, $51,013.08, plus interest on the net amount.

Welded Tube Company of America v. Phoenix Steel Corporation, 377 F.Supp. 74 (E.D.Pa.1974).

The parties had intended their contractual arrangement to continue for five years unless, two years prior to expiration, either gave written notice to terminate. Welded does not contend that the termination, first discussed with it by Phoenix in July, 1968 and finally confirmed as of June 30, 1969, violated the contract, and so we assume that no breach of the pertinent provision occurred.

■ Welded claims that it held a common law artisan's lien for work done on personal property at the owner's request. Restatement of Security § 61 (1941). For the purpose of discussion, it may be assumed that such a lien might have been valid in these circumstances, if the contractual terms were consistent with its existence. However, it is not the policy of the law in Pennsylvania to extend the application of common law liens, and it has been held that there is a waiver of such a lien when a contract between parties provides for delivery of goods on credit. Carbon Silk Mills Co. v. Powell, 108 F.2d 474 (3d Cir. 1939), cert. denied 310 U.S. 625, 60 S.Ct. 896, 84 L.Ed. 1396

---

1. These invoices covered only the fabricated tubing. Welded did not submit invoices for work in progress or for storage and handling charges.

2. Welded's asserted authority for this procedure was Pennsylvania Act of 1925, P.L. 557, 6 P.S. §§ 11–13.

(1940). In addressing a party's contention that a liberal approach should be taken toward artisans' liens, the Pennsylvania Supreme Court said in Mitchell v. Standard Repair Co., 275 Pa. 328, 332, 119 A. 410, 411 (1923):

> "The commercial customs of to-day do not favor the tying up of personal property by liens; and, if the courts should now countenance any such general attitude toward the credit system as that announced in the case relied on by appellant, business, as that term is presently understood, would soon come to a standstill."

Welded relies upon International Electronics Co. v. N.S.T. Metal Products Co., 370 Pa. 213, 88 A.2d 40 (1952), but we find that case distinguishable because of the terms of the contract between those parties. While there was a credit arrangement in the *International* case, the agreement also provided for possession by the artisan for a given period of time in the absence of compliance with a cancellation clause. Since admittedly that clause had been breached, the state court held that the credit arrangement did not negate the right to a lien as a matter of law. United States v. Toys of the World Club, Inc., 288 F.2d 89 (2d Cir. 1961), also cited by Welded, involved a situation where payment was to be made before final delivery and, therefore, is also distinguishable.

There are no contractual limitations on possession involved here, and, therefore, we cannot say that the district court erred in finding that the right to an artisan's lien had been waived by the agreement to permit deliveries on a credit basis.

In Pennsylvania the right to a lien for storage is not extended to an artisan in the absence of contractual entitlement but is limited to warehousemen and those in the business of storage. Mitchell v. Standard Repair Co., *supra*. *See also* Restatement of Security § 64, comment *d* (1941). Hence, Welded was not entitled to a lien for storage.

Having concluded that Welded did not have a lien and was not entitled to retain possession, it follows that it is liable to Phoenix for conversion of its property.

The Pennsylvania courts define conversion as the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without legal justification. Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721 (1964). *See also* Restatement (Second) of Torts § 237 (1965). When Welded refused to relinquish possession of the coils upon demand on June 30, 1969, it converted them and became liable for the fair market value of the steel on that date.[3]

It was incumbent upon Phoenix to establish the fair market value as of June 30, 1969 for both the slit and whole coils. The record, however, contains no precise evidence on this point. The defendant's witness testified that in June, 1969 domestic steel coils ranged in price from $124 to $128 a ton and that foreign steel would have been about $25 less. However, a fair reading of the testimony reveals that the witness was speaking of steel which had not been slit, shot-blasted,[4] and oiled. Part of the steel in stock had been subjected to that processing, and the record does not show whether that operation would have affected the fair market value.

The witness did testify that in August Phoenix had a buyer which would have paid $104 per ton for all of the steel, whether processed or not. That special sale opportunity, however, does not necessarily establish the fair

---

**3.** Phoenix based its claim on the coils' value as of June 30, 1969. We therefore do not reach the interesting question of whether it might have been entitled to the higher price which it could have received from a sale in August, 1969 when Welded once again refused possession. For a reference to the "forced sale" theory of damages in conversion actions, see Restatement (Second) of Torts § 222A, comment *c* (1965).

**4.** This process involves propelling sharp steel pellets at high speed against the surface of the uncoiled steel to remove scaling.

market value on June 30, 1969. Because the record does not establish a proper evidentiary foundation for the determination of fair market value on the critical date, we remand for further findings on that point. It may be that the parties will be able to stipulate to the figure, but, if not, further testimony will be required.

Although Welded was not entitled to a lien for its preliminary work on the coils or for storage of them, the question of whether it was entitled to recover for those items remained open. The nonexistence of a lien merely establishes that there was no right of possession, not that there was no basis for reimbursement. The determination that there was a conversion did not preclude an inquiry into the merits of Welded's claims. If Welded could prove that it was entitled to payment for the items it claimed, then such amounts would be set off against the total claim of Phoenix.

The contract is silent as to the consequences following termination with respect to work which was in progress. After the parties first discussed termination in August of 1968, an exchange of correspondence followed in which Phoenix stated that it no longer intended to sell steel tubing. Phoenix's president wrote to Welded advising that no further coils would be shipped and that the existing inventory would be either fabricated into tubing or sold. Welded did not object to this procedure but noted that its production plans would of necessity be altered so as to allow for the replacement of Phoenix's tonnage. At no time did Welded suggest that it expected payment for any uncompleted work remaining at the time of termination.

In order to understand the nature of Welded's claims, it is necessary to refer briefly to the manufacturing process. The first step in the fabrication of tubing was the unwinding, shot-blasting, and oiling of a steel coil. Thereafter, if the tubing to be formed required less than the full width of the coil, it would be slit longitudinally to the appropriate size. The portion of the coil not required for a given order would then be placed in storage. These slit coils were available for future orders requiring compatible sizes. As the president of Welded explained, it would not be economical to slit the coil first, so as to shot-blast and oil only that portion needed for a specific order. As a result of this practice, Welded had some 1,517 tons of slit coils on hand on June 30, 1969.[5]

Welded attempted to establish the value of the processing that had gone into these slit coils by prorating its production costs. The district court found no credible evidence "to support an award, as claimed in the complaint, to Welded of $50.62 per ton for work performed by it on the slit coils, or for any other amount." 377 F.Supp. at 79.[6] The court concluded that, although Phoenix had acquiesced in the procedure of shot-blasting and oiling an entire coil in a single operation even though only part was to be used to fill a requisition, this method was used to reduce Welded's costs. Welded's testimony conceded that the purpose of the contractual arrangement with Phoenix was to lower the cost of production by increasing volume going through the mill. It was described as a "no profit" contract.

■■■ The plaintiff Welded had the burden of proving its claim, even though the unique nature of the arrangement made it difficult to establish the value which possibly had been added to the slit coils. The question of whether a party has met the burden of proof is particularly one for the trial court. We are unable to say from this record that there was error in the trial court's rejection of the claim when it said " . . . Welded has not established any basis in the terms of dollars to support it." 377 F.Supp. at 84.

---

5. The inventory of coils which had received no processing amounted to 1,138½ tons.

6. The charges fixed by the contract for finished tubing ranged from $30 to $60 per ton, depending upon quantity.

Furthermore, the trial judge noted that, since Welded "purchased" these coils and eventually processed them into tubing, it had received the benefit of the work. Thus, while it could not be assessed with any accuracy, the value, whatever it was, did eventually accrue to Welded since its cost of producing the tubing was reduced.

The claim for storage included the time before the termination of the contract as well as the period thereafter. Since it has been determined that Welded had no right to possession after June 30, 1969, there can be no basis for imposing a charge upon Phoenix for the period of wrongful detention. To this extent the claim for storage must fall.

The same considerations do not apply to the question of Welded's entitlement to compensation for storage before the termination of the contract. As the district court observed, the contract did not provide for a charge or lien for storage nor did the plaintiff contend there was an oral agreement to that effect. The trial court held that, since Welded was not in the warehouse business, it was not entitled to a lien under Pennsylvania law. Mitchell v. Standard Repair, *supra*. This conclusion was correct, but the court did not directly address the question of whether, independent of the claim for the lien, the plaintiff was entitled to storage charges before June 30, 1969. The court's conclusion of law number 7 does state, "Welded did not establish a valid claim for handling and storage of whole coils. Welded impliedly undertook the handling and storage of whole coils as an incidental obligation in the performance of the agreement, and the agreement neither contemplated nor provided for any charges therefor." 377 F.Supp. at 85. Since this case will be remanded in any event, it is desirable that the district court discuss the factual underpinnings of this conclusion of law and whether, in the absence of a valid lien, the plaintiff is entitled to compensation for storage before June 30, 1969.

In treating the claim for handling the steel, the trial court found that Welded's evidence was insufficient to establish any right to payment under the circumstances of this case. We do not find this conclusion to be erroneous, and it must stand.

Accordingly, the case will be remanded for (1) determination of the fair market value of the Phoenix steel in Welded's possession on June 30, 1969, and (2) a clarification of the trial court's holding on the claim for storage before June 30, 1969. In all other respects, we affirm.