In re ASH HANDKERCHIEF CORP.,
d/b/a American Sock & Hosiery,
Debtor.

ASH HANDKERCHIEF CORP.,
d/b/a American Sock &
Hosiery, Plaintiff,

v.

HICKORY FINISHING, INC., Defendant.

Bankruptcy No. 95 B 43566 (SMB).
Adv. No. 95–1212A.

United States Bankruptcy Court,
S.D. New York.

Feb. 5, 1996.

Todtman, Young, Tunick, Nachamie, Hendler & Spizz, P.C., New York City, for Plaintiff; Stanley B. Hendler, Scott S. Markowitz, of counsel.

Rosen, Preminger & Bloom, New York City, for Defendant; David S. Preminger, of counsel.

## MEMORANDUM DECISION REGARDING THE VALIDITY OF DEFENDANT'S LIEN

STUART M. BERNSTEIN, Bankruptcy Judge:

This adversary proceeding requires us to determine the nature and extent of a textile processor's lien under North Carolina law. On the petition date, the defendant Hickory Finishing, Inc. ("Hickory"), held goods delivered by the plaintiff, Ash Handkerchief Corp., d/b/a American Sock & Hosiery (the "debtor" or "Ash"), for processing. Ash owes Hickory substantial sums in connection with unpaid prepetition processing charges, and Hickory asserts a statutory lien in the goods it held. Ash commenced this adversary proceeding to determine the parties' respective rights in these goods and to compel their turnover. The pleadings also raised additional issues.

We conducted a two day trial on an expedited basis, limited to the issue of whether Hickory held a statutory lien under North Carolina law in these goods. Although we conclude that Hickory did not waive its statutory lien, we must reopen the trial and take evidence regarding whether Ash delivered the goods to Hickory in connection with a single contract or multiple contracts. In the latter case, we must then decide which goods pertain to which contracts in order to decide the nature and extent of Hickory's lien.

### FACTS

At all relevant times, Ash sold ladies' hosiery and socks (SF ¶ 2)[1], and Hickory, a North Carolina corporation, dyed and finished men's, women's and children's socks. (SF ¶ 3.) The parties began doing business together in 1987 (SF ¶ 4), and during the last

four years, Hickory has done 90% of the debtor's finishing work. (Trial Transcript, dated October 5, 1995 ("Tr. 1"), at 83.)

The parties apparently had no formal written contract. Instead, Ash delivered goods to Hickory in North Carolina for finishing on an "as needed" basis. Hickory dyed, paired and labeled Ash's goods, and thereafter, shipped the finished goods either to Ash or directly to Ash's customers. (SF ¶ 5.) Hickory billed Ash on terms that required payment within thirty days, but released the goods prior to payment. (SF ¶ 6.)

Hickory could only process goods in certain minimum quantities. As a result, it often processed more goods than the debtor needed at the time. It "stored" the additional finished goods for the debtor, and also "stored" unfinished goods which the debtor had delivered for future processing. It routinely monitored each customer's inventory to make certain that it held sufficient goods to cover the customer's open invoices. (Tr. 1, at 61.) The debtor was no exception, and during the eighteen months before the petition date, the aggregate value of the finished and unfinished goods that Hickory held exceeded the aggregate amount that Ash owed Hickory for processing its goods. (SF ¶ 13.)

During the three year period before the chapter 11 filing, Ash's debt to Hickory ranged from between $40,000.00 to $60,000.00. (Tr. 1, at 88.) However, in early 1995, as Ash began to experience financial difficulties, the debt steadily increased. In July, Ash gave Hickory a $15,000.00 check, but it "bounced." (Tr. 1, at 38.) On August 4, 1995, Hickory's president, Dick Johnson, wrote to Ash expressing concern over the rising debt. (Def.'s Ex. B.) He stated that unless the debtor paid $50,000.00 by August 8, 1995, Hickory would stop shipping Ash's goods. Ash did not pay. On August 9, 1995, Johnson again wrote to the debtor (Def.'s Ex. C), stating that unless Hickory paid the $50,000.00 by August 15, 1995, Hickory would "pursue those avenues necessary to collect these amounts owed us." Ash did not pay, and filed its chapter 11 petition on August 16, 1995. By the petition date, Ash owed Hicko-

---

**1.** SF refers to the parties Stipulation of Facts, submitted to the Court on October 5, 1995.

ry at least $153,637.86 for goods released either to Ash or its customers. (SF ¶ 7.)[2] In addition, Hickory held unfinished griege goods of Ash with a value of at least $159,000.00 (SF ¶ 8.)[3]

On August 25, 1995, debtor's counsel wrote to Mr. Johnson, requesting that Hickory continue to perform finishing services. The debtor proposed to pay on a C.O.D. basis. If Hickory rejected this proposal, the debtor would make immediate arrangements to pick up and deliver its goods to another finisher. In an August 28, 1995 letter, Hickory responded by asserting a textile processor's lien, under North Carolina General Statute 44A–2(f), against all of the debtor's goods in its possession on account of all sums due.

On August 30, 1995, Ash commenced this adversary proceeding. Simultaneously, Ash presented an Order to Show Cause, seeking a turnover of its goods in Hickory's possession. At the hearing, the parties agreed that Hickory would release all of Ash's goods. As long as the goods remained unsold, Hickory retained any lien that it had in those goods. If Ash sold the goods, any valid lien would attach to the proceeds which Ash would segregate in a separate account.

## DISCUSSION

### A. Introduction

■ Section 44A–2(f) of North Carolina's General Statutes grants a lien to textile processors. It provides in relevant part as follows:

Any person who improves any textile goods in the ordinary course of his business pursuant to an express or implied contract with the owner or legal possessor of such goods shall have a lien upon all goods of such owner or possessor in his possession for improvement. The amount of such lien shall be for the entire unpaid contracted charges owed such person for improvement of said goods *including any amount owed for improvement of goods, the possession of which may have been relinquished....*

N.C.Gen.Stat. § 44A–2(f) (emphasis added). This provision codifies the common law. *See In re Duplan Corp.,* 440 F.Supp. 738, 740 (S.D.N.Y.1977); *NCNB Fin. Servs., Inc. v. Stevcoknit, Inc. (In re Stevcoknit, Inc.),* 35 B.R. 389, 391 (S.D.N.Y.1983). Hence, we turn to the common law, in the first instance, to aid our understanding.

### B. The Common Law of Artisan's Liens

■ The common law grants a lien to "a bailee who at the request of the bailor does work upon or adds materials to a chattel." RESTATEMENT (FIRST) of SECURITY ("RESTATEMENT") § 61(a) (1941); *accord Morgan v. Congdon,* 4 N.Y. 552, 553 (1851). Many states have codified this right, including North Carolina. *See* N.C.Gen.Stat. § 44A–2(a); *Barbre–Askew Fin., Inc. v. Thompson,* 247 N.C. 143, 146–47, 100 S.E.2d 381, 384 (1957); *Peace River Elec. Co-op., Inc. v. Ward Transformer Co.,* 116 N.C.App. 493, 500, 449 S.E.2d 202, 208 (Ct.App.1994), *cert. denied,* 339 N.C. 739, 454 S.E.2d 655 (1995). Ordinarily, the artisan loses the lien if he voluntarily and unconditionally surrenders the chattel. *Barbre–Askew Fin., Inc. v. Thompson,* 247 N.C. at 149–50, 100 S.E.2d at 386; N.C.Gen.Stat. § 44A–3; RESTATEMENT § 80(1). If, however, the artisan receives and works on property under a single contract, and surrenders a portion of the property, he still retains a lien on the remaining property in his possession for the full amount of the unpaid processing costs. *E.g., United States v. Toys of the World Club, Inc.* 288 F.2d 89, 94 (2d Cir.1961) (Friendly, J.); *In re Tele King Corp.,* 137 F.Supp. 633, 634 (S.D.N.Y.1955); *In re Lindau,* 183 F. 608, 609 (S.D.N.Y.1910) (L. Hand, D.J.); *In re Mark S. Kaplan, Inc.,* 42 B.R. 288, 290 (Bankr.S.D.Ohio 1984); *Wiles Laundry Co. v. Hahlo,* 105 N.Y. 234, 239, 11 N.E. 500, 502 (1887); *Morgan v. Congdon,* 4 N.Y. at 554; RESTATEMENT § 61, cmt. f ("Where the privilege exists of retaining several chattels until a demand is paid, the surrender of part of the chattels does not reduce the privilege of holding the remaining

---

**2.** In its counterclaim, Hickory claims that Ash owes it $189,763.09.

**3.** On the petition date, Hickory also held finished goods with a value of approximately $10,000.00.

chattels. The lien continues on such chattels until the entire demand is satisfied."); *see also* RESTATEMENT § 80(2) ("Where a lienor surrenders part of a group of chattels upon which a specific possessory lien exists, the lien continues upon the chattels which are retained, as security for the entire demand.").

■ The artisan cannot, however, cross-collateralize his debt. Thus, the property he receives under one contract does not secure the processing costs incurred under a different contract with the same bailor. *See, e.g., Berlet v. Lehigh Valley Silk Mills*, 287 F. 769, 770–71 (3d Cir.1923); *In re Lindau*, 183 F. at 609; *Mark S. Kaplan, Inc.*, 42 B.R. at 290; *Quad/Graphics, Inc. v. R.L. Newport & Co. (In re R.L. Newport & Co.)*, 10 B.R. 436, 438 (Bankr.S.D.N.Y.1981). The RESTATEMENT illustrates this rule through two contrasting illustrations:

5. B brings to a jeweler two watches and a clock for cleaning and repair. The jeweler, after his work is done, allows B to take the watches. Since the articles are all held in connection with a single contract, the jeweler can retain the clock until the whole bill is paid.

6. Same facts as Illustration 5, except that the three articles are brought to the jeweler's on separate days. The jeweler has a lien on the clock only for the amount due for the work on it.

RESTATEMENT § 61, cmt. f, illuss. 5, 6.

### C. The Waiver of the Lien

■ The artisan can, by agreement, waive his common law lien. He often does so by agreeing to extend credit to the bailor. In one of the earlier cases, *Wiles Laundry Co. v. Hahlo*, 105 N.Y. 234, 11 N.E. 500 (1887), the bailor manufactured shirt collars and cuffs, and delivered them to the bailee for laundering. On a daily basis, the bailor delivered "new" goods, and the bailee returned previously delivered and freshly laundered "old" goods. The bailee rendered a bill each month for goods laundered during the prior month, but actual payment was made after the service was rendered and the goods were returned. Eventually, the bailee found itself holding the bailor's goods and owed money for laundry service. The bailee asserted an artisan's lien on the withheld goods, claiming they secured the entire unpaid laundry obligation.

The Court of Appeals acknowledged the common law rule, discussed above, concerning the retention of the lien on the unreturned goods and the rule against cross-collateralization. *Id.* at 239–40, 11 N.E. at 502. It held, however, that no lien arose if the parties fixed a date of payment after the bailee was obligated to return the goods:

[W]here a particular future time of payment is fixed, which may be subsequent to the time when the owner is entitled to a return of the article upon which the work is done, there can be no lien; and that, where the parties contract for a particular time or mode of payment, the workman would have no right to set up a right to possession inconsistent with the terms of his contract; and in such a case there is no lien.

*Id.* at 240, 11 N.E. at 502–03; *accord Welded Tube Co. v. Phoenix Steel Corp.*, 512 F.2d 342, 344–45 (3d Cir.1975) (Pennsylvania law); *Newark Slip Contracting Co. v. New York Credit Men's Adjustment Bureau, Inc.*, 186 F.2d 152, 153–54 (2d Cir.) (New Jersey law), *cert. denied*, 341 U.S. 931, 71 S.Ct. 805, 95 L.Ed. 1361 (1951); *Clark Bros. & Co. v. Pou*, 20 F.2d 74, 76–77 (4th Cir.1927) (Virginia law); *Berlet v. Lehigh Valley Silk Mills*, 287 F. at 772 (Pennsylvania law); *A.L.U. Textile Combining Corp. v. First Hartford Corp. (In re First Hartford Corp.)*, 33 B.R. 126, 127–28 (S.D.N.Y.1983) (New Jersey law); *NCNB Fin. Servs., Inc. v. Stevcoknit, Inc. (In re Stevcoknit, Inc.)*, 28 B.R. 520, 524–25 (Bankr. S.D.N.Y.) (interpreting N.C.Gen.Stat. § 44A–2(f)), *aff'd*, 35 B.R. 389 (S.D.N.Y.1983); *In re Heinsheimer*, 214 N.Y. 361, 366–67, 108 N.E. 636, 638 (1915); *Morgan v. Gray*, 4 N.Y. at 553.

■ The artisan lien waiver cases share a common theme. The artisan agrees to extend the credit before the bailor ever delivers the goods, and this is usually conclusive. Many cases have found that the mere extension of credit, without more, constitutes a waiver of the lien as a matter of law. This conclusion follows from the inherent unfair-

ness to the bailor who the artisan induces to deliver goods in the belief that the artisan is extending credit, only to later learn that the artisan holds the goods hostage until full payment is made. *See In re First Hartford Corp.*, 33 B.R. at 128; *In re Stevcoknit, Inc.*, 35 B.R. at 391 n. 1. On the other hand, if the parties have not agreed to the extension of credit, but the artisan delivers the goods prior to payment, he retains his lien on the balance for all of the processing costs incurred under the same contract. *In re Tele King Corp.*, 137 F.Supp. at 634; *see Welded Tube Co. v. Phoenix Steel Corp.*, 512 F.2d at 344. In the latter circumstance, the bailor does not deliver the goods to the artisan with any expectation of credit, and the artisan is not under a contractual obligation to return the finished goods prior to payment. *In re Tele King Corp.*, 137 F.Supp. at 634; *see In re First Hartford Corp.*, 33 B.R. at 128–29.

 Although the extension of credit provides strong evidence of a waiver, it should not rise to the level of an irrebuttable presumption. Under North Carolina law, "[a] waiver is a voluntary and intentional relinquishment of a known right or benefit." *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 492, 219 S.E.2d 190, 195 (1975); *accord Wachovia Bank & Trust Co., N.A. v. Rubish*, 306 N.C. 417, 425, 293 S.E.2d 749, 754 (1982). Waiver is a question of intent, *Adder v. Holman & Moody, Inc.*, 288 N.C. at 492, 219 S.E.2d at 195, that can be express or implied either by conduct that leads the other party to believe a waiver has occurred or by conduct that misleads. *Klein v. Avemco Ins. Co.*, 289 N.C. 63, 68, 220 S.E.2d 595, 599 (1975). Further, the parties can agree to preserve the artisan's lien in the face of actions that ordinarily cause its loss. *Barbre–Askew Fin., Inc.*, 247 N.C. at 149–50, 100 S.E.2d at 386 ("possessory lien is not necessarily waived or destroyed as between the parties where there is an intention to preserve the lien ...") (quoting *Yellow Mfg. Acceptance Corp. v. Bristol*, 193 Or. 24, 40, 236 P.2d 939, 946 (1951)). Intention is a question of fact, and the extension of credit does not conclusively destroy the artisan's lien in the face of contrary contractual or other evidence. *See International Elec. Co.*

*v. N.S.T. Metal Prod. Co.*, 370 Pa. 213, 222–23, 88 A.2d 40, 45 (1952).

This essentially was the reasoning of the district court in *In re Stevcoknit, Inc.*, 35 B.R. 389 (S.D.N.Y.1983), although it affirmed the bankruptcy court's conclusion that the processor had waived its lien. The case involved the same North Carolina statute at issue here, and virtually identical facts. The bankruptcy court concluded as a matter of law that no lien existed because the processor had extended credit to the debtor-bailor. *In re Stevcoknit, Inc.*, 28 B.R. at 524–25. On appeal, the processor's factor argued that the North Carolina statute gave greater rights than the common law because the statute expressly provides that the lien continues even if the processor releases the goods. Finding some merit to this argument, Judge Duffy stated that "[w]hen the value of the retained goods is sufficient to secure full payment, the processor can still be relying on the retained goods' physical possession to secure payment." *In re Stevcoknit, Inc.*, 35 B.R. at 391. The crucial consideration is the processor's intent; did the processor rely on the goods in its possession or on the customer's credit and ability to pay:

> The North Carolina statute does no more than expressly provide for those potential situations in which the processor intends the physical possession of some goods to secure payment for processing work done on all of the goods. Likewise, the statute does not change the principle that when the processor extends credit, releasing goods during the normal course of completing their processing, this voids any statutory processor's lien.

*Id.*

### D. The Status of Hickory's Lien

 We agree with the district court, although we believe that Section 44A–2(f) merely codifies the common law rules discussed above and does not expand the processor's rights. Thus, absent a waiver, the statute grants a lien to Hickory for its processing costs. On the petition date, if Hickory held goods delivered under more than one contract, its processing costs incurred in con-

nection with any particular contract would be secured only by those goods delivered pursuant to that same contract.

 This brings us to the issue of waiver. Although the lien creditor opposing a turnover bears the burden of proving the validity of its security interest, *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 211–12, 103 S.Ct. 2309, 2316–17, 76 L.Ed.2d 515 (1983), 11 U.S.C. § 363(*o*)(2), waiver is an affirmative defense, Fed.R.Civ.P. 8(c), and Ash must prove it. We heard testimony from two witnesses over two days, and received several documents into evidence. The undisputed record shows that the parties dealt on a credit basis in the past, and this constitutes *prima facie* proof that Hickory intended to waive its lien. It is not, however, conclusive. Moreover, based upon the proof presented at the trial, we conclude that Ash failed to carry its burden of proof.[4]

According to Johnson, Hickory always retained a sufficient amount of Ash's greige goods on hand to cover Ash's debt. (Tr. 1, at 67.) In addition, the parties stipulated that during the eighteen months preceding the filing of Ash's petition, the value of the goods Hickory held always exceeded the amount that Ash owed. (SF ¶ 13.) This provides evidence that Hickory continued to rely on its lien even though it released goods on credit. *See Stevcoknit, Inc.*, 35 B.R. at 391.

When Ash's debt began to increase, Johnson became concerned, but took comfort in the knowledge that Hickory could liquidate Ash's goods to satisfy its debt. (Tr. 1, at 62–63.) But when Ash's increasing problems reached what Johnson seemingly viewed as epic proportions, he became more adamant about protecting Hickory's position. His August 1995 letters to Ash clearly state that

Hickory would no longer ship goods, and would resort to all available legal remedies. Edward Ash, the debtor's vice-president and the person who dealt with Johnson, never protested that Hickory had no right to withhold shipments, at least until the lawyers became involved and filed the bankruptcy.

To the contrary, Edward Ash also expressly recognized Hickory's lien rights. Johnson testified that after Ash's $15,000.00 check "bounced,"

> Mr. Ash put his arm around my shoulder and assured me, Hickory Finishing would never be hurt, that we had all of those greige goods out there that would cover anything.

(Tr. 1, at 37–38.) Although Edward Ash testified during the debtor's subsequent rebuttal case, he never refuted these statements. This testimony went to the core of the issue being tried, and the failure to controvert this attributed admission convinces us that it must be true.

 Ash's reassurance, coupled with the failure to protest Hickory's August 1995 threat to withhold shipments of finished goods, satisfies us that the parties did not deal solely on a credit basis. In addition, Hickory took steps to ensure the value of its lien. It continually monitored its customers' inventory levels, and retained goods with a value that exceeded the unpaid processing costs. Accordingly, we find that although Hickory received unfinished goods from Ash with the understanding that it would finish and ship the goods prior to payment, the parties understood that Hickory could look to the remaining goods if Ash ultimately failed to pay. This is the essence of a lien, and the fact that Johnson, a layman, did not use the word "lien" is irrelevant.[5]

---

4. This conclusion does not depend upon Johnson's testimony, which we found credible in all respects, regarding what he alone intended or understood. In this regard, he stated that he established Hickory's credit billing practices when he bought the company in 1981, but nonetheless understood from what his attorney told him at that time that Hickory had recourse against the goods in its possession for unpaid processing fees. (Tr. 1, at 62.).

5. While Hickory eventually became a member of the unsecured creditors' committee, we do not

view the event with the same significance as the debtor. On August 31, 1995, after Ash commenced this adversary proceeding, Hickory accepted the United States Trustee's invitation to join the official committee of unsecured creditors. Johnson signed an Acceptance/Rejection Form (the "Form") (Debtor's Ex. 1), stating that Hickory held an unsecured claim in the amount of $169,732.59. Johnson testified that he first received a facsimile copy of the Form on August 25, 1995 from another of Ash's finishers, and paid little attention to it. (Trial Transcript, dated

Hickory must still shoulder a potentially substantial evidentiary burden. Regardless of the parties' intentions, Hickory's rights are based on a specific statute. Consistent with the common law, N.C.Gen.Stat. § 44A–2(f) does not allow cross-collateralization, and grants a lien in retained goods to cover the finishing costs incurred in connection with the same contract or transaction. Given the expedited nature of the trial and the issues we framed and tried, the parties offered little if any evidence concerning their business relationship, the nature of the transaction or transactions that resulted in the unpaid processing fees, and the relationship between those debts and the retained goods. Consequently, we are reopening the proof for this purpose and to determine the remaining issues. The parties are directed to contact chambers to schedule a pre-trial conference to complete the pleadings, schedule any additional discovery and try the remaining issues.

Nov. 9, 1995, at 127–28.) He received Hickory's copy on or about August 28, 1995, but did not fill it out because he believed that Hickory held a secured claim. (*Id.* at 132.) He filled it out and returned the Form as a contingency only after Ash formally challenged Hickory's lien. (*Id.* at 135.) He never believed, however, that by doing so, Hickory was waiving any lien it had. (*Id.* at 136.)