Thomas H. YOUNGER et al.

v.

Robert PLUNKETT et al.

Civ. A. No. 73-1700.

United States District Court,
E. D. Pennsylvania.

June 13, 1975.

David A. Scholl, Delaware County Legal Assistance Association, Inc., Chester, Pa., for plaintiffs.

James P. McElree, II, West Chester, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

The instant case is another in the massive assault upon creditor prejudgment remedies which have flowed from the watershed decisions of *Sniadach* v. *Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and *Fuentes* v. *Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).[1] Plain-

1. E. g. North Georgia Finishing v. DiChem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975) (Georgia garnishment procedure); Mitchell v. W. T. Grant Co., 416 U.

tiffs challenge the constitutionality of Pennsylvania possessory lien law under which a bailee performing services with respect to the goods of another person is entitled to retain custody and to sell those goods to satisfy his charges for the services performed. Pursuant to 42 U.S.C. § 1983 they seek to enjoin this practice in the Commonwealth of Pennsylvania as a violation of the Fourteenth Amendment due process standards of the United States Constitution because, they claim, under Pennsylvania law the bailee is legally permitted to take the property of the lien debtor without invoking the legal process and without affording the property owner the opportunity to be heard before an impartial tribunal. I find it unnecessary to reach the constitutional issues upon which plaintiffs predicate their right to relief in this Court, for I find that upon the undisputed facts of this case the plaintiffs have not established that defendants do have possessory liens on their property under Pennsylvania law.

The named plaintiffs own automobiles presently in the possession of defendant towing companies which refuse to surrender possession of them until certain towing and storage charges are paid. John Shumate alleges that he was in the habit of parking his automobile on a vacant lot located on Lombard Street between 20th and 21st Streets in Philadelphia, Pennsylvania. Allegedly, he had parked there regularly during May and June of 1973, and during that period the lot was not posted with any signs warning that parking was not permitted there or that vehicles parked there without authorization would be towed away at the owner's expense. On July 7, 1973, Shumate again left his car at the Lombard Street lot, and when he returned two days later on July 9th, his automobile was gone and the lot was posted with signs warning that parking was prohibited. Subsequently, Shumate learned that his automobile had been towed away by Ruffie's Towing Service (hereinafter "Ruffie's") and that his automobile was being held at its place of business. Shumate was informed by Ruffie's that in order to recover his automobile he must first pay a towing fee to Ruffie's of $44.50 plus $4.00 per day in storage charges. Shumate has not paid the fee and his automobile is still in Ruffie's possession.

On June 4, 1973, Thomas A. Younger was involved in an automobile accident when the car he was driving collided with another vehicle at the intersection of West Chester Pike and Five Points Road, West Goshen Township, Chester County, Pennsylvania. Younger claims that the accident was the fault of the other driver. The police arrived soon after the accident accompanied by the truck from West End Towing Service (hereinafter "West End"), and while Younger spoke to the police officer about the accident, West End towed his car away from the intersection to its place of business. Younger alleges that he did not consent to the tow, and West End, not disputing this allegation, claims that it was ordered to tow the vehicle by the West Goshen police department. Younger was informed by West End that the bill for towing was $15.00 and the storage charges were $53.00 as of July 10, 1973. Younger did not pay the charges and his automobile has remained in the possession of West End. On July 13, 1973, Younger went to West End's place of business to remove some

S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (Louisiana sequestration statute); Gibbs v. Titelman, 502 F.2d 1107 (3d Cir. 1974) (Pennsylvania Motor Sales Financing Act); Turner v. Impala Motors, 503 F.2d 607 (6th Cir. 1974) (Tennessee self help repossession statute); Phillips v. Money, 503 F.2d 990 (7th Cir. 1974) (Indiana mechanics lien statute); Hall v. Garson, 468 F.2d 845 (5th Cir. 1972) (Texas landlord lien); Hammond v. Powell, 462 F.2d 1053 (4th Cir. 1972) (South Carolina "claim and delivery" statute); Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972) (discontinuance of electric service for nonpayment of charges under Wisconsin administrative regulations).

parts from his vehicle and he was refused entry to do so. Thereafter, in an attempt to use his own brand of self help repossession, Younger entered the West End property and was arrested by the local police for criminal trespass. He was ultimately convicted on the charge.

The plaintiffs have brought a class action under 42 U.S.C. § 1983 claiming that the statutory basis for defendants' retention of plaintiffs' vehicles violates the due process clause of the United States Constitution.[2] The original complaint cited the Act of December 14, 1863, P.L. 1127, §§ 1, 3; 6 P.S. §§ 15,

17[3] as the legal authority for defendants' retention of the automobiles, but these statutes are by their terms sales provisions which grant those having liens for carriage, storage, and labor under existing law the right to satisfy that lien through sale of the goods subject to the lien; they do not create a statutory lien. Also these provisions were repealed in 1953 insofar as they set forth sale procedures for carriers and warehousemen. 12A P.S. § 10–102. Consequently, the original complaint was dismissed and plaintiffs were granted leave to file an amended complaint.[4] In their amended complaint plaintiffs again cited

---

2. Plaintiffs bring suit on behalf of all Pennsylvania residents against whose property a lien has been asserted or against whom such lien will be asserted in the future and they seek to enjoin all persons and business entities from maintaining or asserting such liens pursuant to the Act of Dec. 14, 1863, P.L. 1127, § 1; 6 P.S. § 15.

3. 6 P.S. §§ 15, 17 read:
   § 15. Lien on goods for carriage, storage or labor; sale of goods
   In all cases, in which commission merchants, factors and all common carriers, or other persons, shall have a lien, under existing laws, upon any goods, wares, merchandise, or other property, for, or on account of, the costs, or expenses, of carriage, storage, or labor bestowed on such goods, wares, merchandise, or other property, if the owner, or consignee of the same, shall fail, or neglect, or refuse to pay the amount of charges upon any such property, goods, wares, or merchandise, within thirty days after demand thereof, made personally upon such owner, or consignee, then, and in such case, it shall and may be lawful for any such commission merchant, factor, common carrier or other person, having such lien, as aforesaid, after the expiration of said period of thirty days, to expose such goods, wares, merchandise, or other property, to sale, at public auction, and to sell the same, or so much thereof, as shall be sufficient to discharge said lien, together with costs of sale and advertising: Provided,
   That notice of such sale, together with the name of the person, or persons, to whom such goods shall have been consigned, shall have been first published for two successive weeks, in a newspaper, published in the county, and by six written, or printed handbills put up in the most public

and conspicuous places in the vicinity of the depot where the said goods may be.
   § 17. Disposition of proceeds
   The residue of moneys arising from any such sales, either under the first or second sections of this act, after deducting the amount of the lien, as aforesaid, together with costs of advertising and sales shall be held subject to the order of the owner or owners of such property.
   Since the constitutionality of a state statute was at issue, I directed the plaintiff to notify the Office of Attorney General for the Commonwealth of Pennsylvania of the pendency of this litigation to afford the Commonwealth an opportunity to intervene. The Commonwealth informed the Court it did not intend to participate in the lawsuit.

4. The tortuous procedural history of this litigation and the consequent delay in getting a record upon which an informed judgment could be made as to the substantive issues makes this one of the older cases upon my docket. The motions for summary judgment under the original complaint were scheduled for argument in September 1973, but because the suit involved the constitutionality of a Pennsylvania statute, I directed the plaintiff to notify the Commonwealth of the pending litigation. Subsequently, the Pennsylvania Attorney General's office advised the Court that it was declining any participation in the case, and thus oral argument by the parties was heard on October 12, 1973. On June 7, 1974, I issued an order dismissing the complaint, citing the partial repeal of 6 P.S. §§ 15, 17. Plaintiffs moved to amend judgment and to grant leave to amend their complaint, and I directed plaintiff to file additional briefs on the question of state action in view of the then recent decision of Gibbs v. Titelman, 502 F.2d 1107

6 P.S. §§ 15, 17 but in the alternative they cited 12A P.S. §§ 7–307, 7–308 [5] as the target of their constitutional challenge. 12A P.S. § 7–308 is a sales provision superceding 6 P.S. §§ 15, 17 as to carrier's liens and it, like its predecessor, does not by its terms create such liens. 12A P.S. § 7–307 does create a statutory lien in favor of carriers upon goods covered by a bill of lading.

Plaintiffs have moved for a preliminary injunction, a class determination, and a partial summary adjudication on the issue of the constitutionality of 6 P. S. §§ 15, 17, and 12A P.S. §§ 7–307, 7–308. Defendants have filed cross mo-

(3d Cir. 1974). After considering plaintiffs' proposed amended complaint and supplemental brief, I vacated the order of dismissal, granted plaintiff leave to amend, and amended motions and briefs were filed as to the amended complaint in January 1975. The final argument upon the amended motions for summary judgment were submitted on briefs on my March 5, 1975 argument list.

5. 12A P.S. §§ 7–307, 7–308 read:
§ 7–307. Lien of Carrier
(1) A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods or incident to their transportation or reasonably incurred in their sale pursuant to law. But against a purchaser for value of a negotiable bill of lading a carrier's lien is limited to charges stated in the bill or the applicable tariffs, or if no charges are stated then to a reasonable charge.
(2) A lien for charges and expenses under subsection (1) on goods which the carrier was required by law to receive for transportation is effective against the consignor or any person entitled to the goods unless the carrier had notice that the consignor lacked authority to subject the goods to such charges and expenses. Any other lien under subsection (1) is effective against the consignor and any person who permitted the bailor to have control or possession of the goods unless the carrier had notice that the bailor lacked such authority.
(3) A carrier loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.
§ 7–308. Enforcement of Carrier's Lien
(1) A carrier's lien may be enforced by public or private sale of the goods, in block or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the carrier is not of itself 'sufficient to establish that the sale was not made in a commercially reasonable manner. If the carrier either sells the goods in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold he has sold in a commercially reasonable manner. A sale of more goods than apparently necessary to be offered to ensure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence.
(2) Before any sale pursuant to this section any person claiming a right in the goods may pay the amount necessary to satisfy the lien and the reasonable expenses incurred under this section. In that event the goods must not be sold, but must be retained by the carrier subject to the terms of the bill and this Article.
(3) The carrier may buy at any public sale pursuant to this section.
(4) A purchaser in good faith of goods sold to enforce a carrier's lien takes the goods free of any rights of persons against whom the lien was valid, despite noncompliance by the carrier with the requirements of this section.
(5) The carrier may satisfy his lien from the proceeds of any sale pursuant to this section but must hold the balance, if any, for delivery on demand to any person to whom he would have been bound to deliver the goods.
(6) The rights provided by this section shall be in addition to all other rights allowed by law to a creditor against his debtor.
(7) A carrier's lien may be enforced in accordance with either subsection (1) or the procedure set forth in subsection (2) of Section 7–210.
(8) The carrier is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion.

tions for summary judgment and West End has filed a counterclaim against Younger for its towing and accrued storage charges in the amount of $168.-00 as of August 29, 1973. Plaintiffs pray that the Court order the return of the Younger and Shumate vehicles and enjoin their sale. Also, on behalf of the class they pray that 6 P.S. §§ 15, 17, or in the alternative 12A P.S. §§ 7–307, 7–308 be declared unconstitutional, and that defendant class be enjoined from retaining or selling any property under these statutes *in praesenti* and *in futuro*.

## LEGAL DISCUSSION

Although plaintiffs contend that the possessory liens asserted by defendant towing companies contravene due process standards, the substantial preliminary issue must be resolved of whether the defendants are legally entitled to such liens under the circumstances which plaintiffs allege. This is a question of Pennsylvania law. Of course federal courts approach the resolution of constitutional issues with wise reluctance and as a general policy will resolve legal controversies upon non-constitutional grounds in preference to making constitutional adjudications. *Ashwander* v. *Tennessee Valley Authority,* 297 U.S. 288, 346, 347, 56 U.S. 466, 482, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). But the state law issues of this case not only present a prefered basis of adjudication, they must be resolved to determine whether the plaintiffs have a constitutional claim, for if defendants are not holding plaintiffs' property pursuant to any state law, then the constitutional dispute is not a true case or controversy but merely an abstract legal question upon which the

Court is being urged to render an advisory opinion. *Muskrat* v. *United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Particularly in view of the plaintiffs' uncertain position as to the state law authority for defendants' lien it is appropriate that I focus on the legal basis upon which the liens are allegedly asserted. Plaintiffs challenge two aspects of Pennsylvania possessory liens: (1) the lien itself which can arise by statute or at common law and (2) the lien creditor's right of sale to enforce his lien which was not recognized at common law and is exclusively a statutory right. The right of sale provisions (6 P.S. §§ 15, 17; 12A P.S. § 7–308) are not limited in their application to statutory liens, and thus, although plaintiffs have not attacked common law liens *per se* as unconstitutional, their challenge to the sale provisions makes necessary not only a determination of whether defendants have the statutory lien cited, but also, whether they have a lien under common law principles.

### Possessory Liens at Common Law

Possessory liens are fundamentally consensual in nature and arise from some agreement, either express or implied, between the owner of goods and his bailee who renders some service with respect to those goods. At common law the right of a bailee to assert a lien meant the right to physically retain custody of the goods, even upon demand of the owner for their return, until the bailee was compensated for his services.[6]

At its inception the common law lien was limited to those circumstances where a lien creditor undertook to render his services upon the implied promise of the lien debtor to pay him. Since at early common law the action of

---

6. The word lien means literally a string or tie, an apt description of the interest which the bailee held in the goods. The common law possessory lien was a very limited right in the debtor's goods. The goods could not be sold to satisfy the lien. The bailee had no right of present use and enjoyment. His lien did not extend to all of the debtor's property in his possession, but only to the goods upon which he had rendered the service. If he voluntarily relinquished possession of the goods to another, the lien was lost. The lien was not assignable. R. A. Brown, *The Law of Personal Property,* § 107 et seq. (1955).

assumpsit was not recognized, the lien provided such creditors an extrajudicial remedy to collect their unliquidated debt, and consistent with this limited purpose, the lien did not arise where the lien creditor had an action at law upon an express contract to pay a sum certain. However, when the action of assumpsit on contracts implied in fact became available, the creditor's possessory lien was not abolished, and it was eventually extended to creditors who were party to an express contract as well as an implied contract. *Mathias* v. *Sellers*, 86 Pa. 491 (1878), citing *Chase* v. *Westmore* 5 Maule & Sel. 180 (K.B.1816), *Brown, Personal Property* at 510, 511.[7]

■ The consensual quality of the transaction which gave rise to possessory liens at early common law has been held an indispensable element of the common law possessory lien recognized by Pennsylvania courts, and this principle is nowhere more clearly stated than in *Meyers* v. *Bratespiece*, 174 Pa. 119, 34 A. 551 (1896). In *Meyers* the plaintiff contracted with one Abraham Harris to have cloth made into coats at thirty-five cents per coat. Harris then contracted with the defendant, without plaintiffs' knowledge or consent, to have the cloth made into coats at fifty cents per coat and thereafter absconded after collecting part of the money due from plaintiff. After the coats were made, defendant refused to deliver them to plaintiff and claimed a possessory lien, and plaintiff brought an action in replevin. The court held:

"We agree with the learned court below that Bratespiece had no lien for his labor on the goods of the plaintiffs that he received from Harris, their bailee. There was no contractual relation between him and the owners.

\* \* \* \* \* \*

'Whenever a workman or artisan, by his labor or skill, increases the value of personal property placed in his possession to be improved, he has a lien upon it for his proper charges until paid, but 'in order to charge a chattel with this lien the labor for which the lien is claimed must have been done at the request of the owner, or under circumstances from which his assent can be reasonably implied. It does not extend to one not in privity with the owners.' 13 Am. & Eng.Ency. of Law, pp. 590, 591; Clark v. Hale, 34 Conn. 398, and Hollingsworth v. Dow, 19 Pick. 228. These appear to be well-settled principles relating to and governing the common-law lien which Bratespiece claimed he had on the plaintiffs' goods, but they very clearly demonstrate, we think, that his claim was without any just or legal foundation."

This principle has been followed by Pennsylvania courts without exception. *Midland Credit Co.* v. *White*, 175 Pa.Super. 314, 104 A.2d 350 (1954); *Automo-*

---

7. "The non-existence of the promise implied, in fact, in early times, also makes intelligible a distinction in the law of lien, which greatly puzzled Lord Ellenborough and his colleagues. Williams, J., is reported to have said in 1605: 'If I put my cloths to a tailor to make up: he may keep them till satisfaction for the making. But if I contract with a tailor that he shall have so much for the making of my apparel, he cannot keep them till satisfaction for the making.' In the one case, having no remedy by action, he was allowed a lien, to prevent intolerable hardship. In the other, as he had a right to sue on the express agreement, it was not thought necessary to give him the additional benefit of a lien. As soon as the right to recover upon an implied *quantum meruit* was admitted, the reason for this distinction vanished. But the acquisition of a new remedy by action did not displace the old remedy by lien. The old rule, expressed, however, in the new form of a distinction between an express and an implied contract, survived to the present century. At length, in 1816, the judges of the King's Bench, unable to see any reason in the distinction, and unconscious of its origin, declared the old *dicta* erroneous, and allowed a miller his lien in the case of an express contract." Ames, History of Assumpsit, 2 Harv.L.Rev. 61 (1888).

*bile Finance Co.* v. *Markman,* 82 Pa.Super. 478 (1923); *Bankers Commercial Security Co., Inc.* v. *Brennan and Levy,* 75 Pa.Super. 199 (1920); *Hecht* v. *Valkone Dye & F. Works,* 66 Pa.Super. 97 (1917); *Automobile Finance Co.* v. *S. C. Rodgers Carriage Co.,* 3 Pa.D. & C. 714 (Phila.C.P.1923); *Auto Transit Co.* v. *Vicibradic,* 26 Pa.Dist. 649 (Phila.C. P.1916); *North German Lloyd* v. *Reading Bone Fertilizer Co.,* 21 Pa.Dist. 1110 (Berks C.P.1911).

The issue of owner's assent for services arises frequently in the area of automobile financing. A typical case is *Midland Credit Co.* v. *White, supra,* wherein the defendant lessor purchased his automobile under a bailment lease which had been assigned to Midland Credit Co. After an accident the defendant lessor left his automobile with co-defendant garage for repairs. While the automobile was in possession of the garage for repairs made at the lessor's request, the lessor defaulted on the lease and Midland brought an action in replevin against the garage for the vehicles return. The Court held that the garage held no lien on the vehicle as against the lessee unless the lessee had assented to the repairs made by defendant garage.

The most recent case on the subject is *Welded Tube Company of America* v. *Phoenix Steel Corp.,* 377 F.Supp. 74 (E. D.Pa.1974), *aff'd and remanded,* 512 F. 2d 342 (3d Cir. 1975), wherein the plaintiff steel fabricator asserted a possessory lien upon the steel of defendant steel maker which plaintiff held under a requirements contract [8] after the contract had been terminated. The Court held that as to the plaintiff's claim for storage, handling, and preparation costs of the raw steel, there was no possessory lien under the common law in Pennsylvania since the contract between the

parties did not contemplate charges to the buyer for these expenses. The scope of a lien or its very existence is predicated upon the existence of some agreement between the parties either expressed or implied. *Id.* at 81 n. 2.

While there is no Pennsylvania authority directly on point, courts in other states have construed the parameters of the common law possessory lien consistently with the *Meyers* doctrine under circumstances similar to those of the present case. In *Murrell* v. *Trio Towing Service,* 294 So.2d 331 (Dist.Ct.App.Fla. 1974), the plaintiff's automobile was towed from a no parking area of an apartment parking lot by defendant towing company at the direction of apartment owner.[9] The court reversed the trial court's dismissal of plaintiff's action for conversion against the towing company stating:

"Generally, it has been held that there being no lien at the common law upon an automobile for the towage and storage charges thereon, in the absence of a statute creating such a lien or in the absence of an agreement, express or implied with the owner of a motor vehicle or someone authorized by him a garageman acquires no lien therefor. 38 Am.Jur. 2d, Garages And Filling And Parking Stations §§ 140, 145, 146 (1968); 50 A.L.R. 1303, Annot., 1309 (1927); Annot., 48 A.L.R.2d 894 (1956).

"In the case at bar, there being no agreement, express or implied, by the appellant Murrell or someone authorized by him and further there being no statute [2] under the instant circum-

"2. We note that if plaintiff's car had been towed away pursuant to police authority, then F.S. § 85.031 F.S.A. would be applicable.

stances creating a lien, the appellees Trio Towing and McCoglin were not

8. A requirements contract is one ". . . calling upon one party to supply the requirements of another's business. . . ." Requirements Contracts: Problems of Drafting and Construction, 78 Harv.L.Rev. 1212 (1965).

9. The trial court entered a directed verdict in favor of the apartment owners, and that judgment was affirmed upon appellant's concession of the right of the property owners to have the vehicle removed from their lot.

**710**

entitled under the law to a lien on complainant's vehicle for the towage and storage thereof. Thus, we only can conclude that these two defendants legally could not withhold the automobile from the owner thereof until payment of the above charges. Therefore, the undisputed facts demonstrate that Trio Towing Service, Inc. and B. L. McCoglin are liable for the conversion of plaintiff-appellant's car.[3] 294

"3. Defendants Trio and McCoglin should look to the apartment owners for the towing and storage charges."

So.2d at 333.

\*    \*    \*    \*    \*    \*

■ The power of the police to remove a disabled vehicle from a public way is not contested, but absent a statutory authorization, police are not thereby empowered to create a lien upon the vehicle in favor of a private towing company which is effective against the vehicle owner without his consent. Again Pennsylvania courts have not addressed this precise issue, but the Supreme Court of Pennsylvania in *Mitchell* v. *Standard Repair Co.*, 275 Pa. 328, 332, 119 A. 410, 411 (1923), in language recently quoted with approval by the Court of Appeals for the Third Circuit, has declined to take a liberal approach towards the common law artisan's liens.[10] Also, in those cases arising in other states wherein the power of the police to impose such a lien has been asserted by a private towing company, this contention has consistently been rejected.

In *Brown* v. *Ace Motor Co.*, 30 Ala. App. 479, 8 So.2d 585 (Ct.App.Ala.1942) *cert. denied* 243 Ala. 92, 8 So.2d 588

(1942), plaintiff's automobile was stopped at the side of an Alabama highway due to mechanical difficulties. To remove the danger of an accident, an Alabama State Highway Patrolman ordered defendant Ace Motor Company to tow plaintiff's vehicle over plaintiff's protest.[11] Plaintiff sued in detinue for the return of his vehicle by defendant who had refused to relinquish possession until the towing and storage charges were paid; defendant counterclaimed upon a plea of recoupment for the charges. The trial court sitting without a jury entered judgment in favor of the defendant, and the Court of Appeals of Alabama reversed and remanded, holding that although the highway patrolman was authorized by statute to move the plaintiff's vehicle, the towing company did not acquire legal authority to charge the plaintiff with the cost of the tow and storage. The Alabama Supreme Court denied certiorari.

Similarly in *Rickenberg* v. *Capitol Garage*, 68 Utah 30, 249 P. 121, 123, 124 (1926), the police had plaintiff's vehicle stored by defendant garage after plaintiff's arrest and conviction for drunken driving. The defendant argued that it had acquired a lien on the automobile for storage and the Supreme Court of Utah stated:

"Proceeding now to the second proposition before stated, Was the appellant under any view of the law authorized to claim a lien on the car for storage charges? This question, on several occasions, under facts and circumstances analogous to those in the case at bar, has been before the

---

10. Chief Justice Moschzisker writing for the Pennsylvania Supreme Court answered the contention that the doctrine of liens in favor of bailees was advancing.

"The commercial customs of to-day do not favor the tying up of personal property by liens; and, if the courts should now countenance any such general attitude toward the credit system as that announced in the case relied on by appellant, business, as that term is presently understood, would soon come to a standstill."

See Welded Tube Co. of America v. Phoenix Steel Corp., 512 F.2d 342, 345 (3d Cir. 1975).

11. The tow truck operator testified on cross examination:

"Well, we were in a tight place—the negro said don't move it—the police said 'Get it out of here, someone may get hurt.'" Brown v. Ace Motor Co., supra, 8 So.2d at 587.

courts, and so far as we have been able to ascertain from the cases no court has ever held that, in the absence of an express statute creating such a lien, or in the absence of a contract or agreement between the owner or his authorized agent and the garage owner, the latter may lawfully assert a lien for storing or safely keeping an automobile. In the following, among other, cases it has expressly been held that the owner of a garage can acquire no lien upon an automobile for storing the same, in the absence of an express statute creating such a lien, and in the absence of a contract or agreement between the parties giving such a lien. Pollard v. Borneman, 47 S.D. 622, 201 N.W. 525, 36 A.L.R. 954; Lewis v. Best-By-Test Garage, 200 Iowa 1051, 205 N.W. 983; Rehm v. Viall, 185 Ill.App. 425; White v. Texas Motor Car & S. Co. (Tex.Civ.App.) 203 S.W. 441; Fishback v. Foster, 23 Ariz. 206, 202 P. 806; Berry, Automobiles (4th Ed.) § 1455."

*See also, Burns Motor Co.* v. *Briggs,* 27 Ohio App. 80, 160 N.E. 728 (1928).

■ No exception to the assent requirement in the creation of possessory liens is recognized at common law under circumstances alleged in the present case, and no such exception has been construed as arising by implication from the authority of a police officer to remove a disabled automobile from a public way or the right of a property owner to remove a vehicle left on his property without his consent.[12] That is not to say that in some jurisdictions police officers and perhaps even property owners do not have such power, but it is one expressly granted by statute or ordinance. *E. g. Stypmann* v. *Nelder,* No. C–70–2315 AJZ (N.D.Cal. February 8, 1974; April 16, 1974);[13] *Murrell* v. *Trio Towing Service, supra,* 294 So.2d at 333 n. 2. From the authorities my research has disclosed both in Pennsylvania and in other states, it is my conclusion that the Supreme Court of Pennsylvania if confronted with the state law question of whether these defendants have common law possessory liens on plaintiffs' automobiles would follow *Meyers* v. *Bratespiece, supra,* and find that in the absence of plaintiff's assent to the towing neither defendant is entitled to a possessory lien under common law principles. *Erie R. Co.* v. *Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 1A Moore's Federal Practice ¶10.309[2] (2d ed. 1965).

*Possessory Lien by Statute*

■ Despite counsel for plaintiffs' efforts to identify in this case a statutory peg upon which to hang his constitutional claim as to the possessory liens which defendants allegedly assert, neither defendant has admitted reliance upon any specific statute as the legal basis for retaining possession of plaintiff's vehicle although they defend the posses-

12. The plaintiffs do not here contest the right of the police officer to have the automobile removed from the public way or the right of the lot owner to remove the vehicle from his vacant property.

13. In Stypmann v. Nelder, *supra,* the plaintiffs challenged the constitutionality of § 22851 of the California Vehicle Code which read:

"Whenever a vehicle has been removed to a garage under the provisions of this chapter and the keeper of the garage has received the notice or notices as provided herein, the keeper shall have a lien dependent upon possession for his compensation for towage and for caring for and keeping safe such vehicle for a period not exceeding 60 days and, if the vehicle is not recovered by the owner within said 60 days or the owner is unknown, the keeper of the garage may satisfy his lien in the manner and after giving the notices required in Sections 3071 and 3072 of the Civil Code. Notwithstanding the provisions of this section, if the vehicle is appraised at a value not exceeding one hundred dollars ($100) by a person authorized to make such appraisal, the keeper of the garage may, if the vehicle is not recovered by the owner within 20 days or the owner is unknown, satisfy his lien as provided in Section 3073 of the Civil Code or Section 22705 of this code."

sory. lien as a constitutional prejudgment remedy for creditors. In their amended complaint the plaintiffs contest the constitutionality of 6 P.S. §§ 15, 17 and in the alternative 12A P.S. §§ 7–307, 7–308 as the legal authority for defendants' possession of the vehicles. However, the undisputed facts of record do not support plaintiffs' contention that these provisions afford either of the defendants a possessory lien. 6 P.S. §§ 15, 17 are sale provisions and those who are entitled to sell property under their procedure are those who have liens under existing law. Also, this statute was repealed as to carriers in 1953 by the Uniform Commercial Code. 12A P. S. § 7–308, also a sale provision, has superceded 6 P.S. §§ 15, 17 as to carriers and has effect only when the carrier has a lien upon the goods to be sold. Neither of these provisions can be considered the source from which the defendants derive authority to retain custody of the vehicles as lien creditors.

12A P.S. § 7–307 does create a carrier's lien, but, from the state of the present record, the circumstances under which the defendants came into possession of plaintiffs' vehicles do not give rise to a § 7–307 lien and also do not give rise to a lien which would be effective against the plaintiffs. One requirement of a § 7–307 lien is that the goods be covered by a bill of lading. The prior legislative provision to this section is 6 P.S. § 76 which was repealed when the Code was enacted. This provision was part of the old Bills of Lading Act and concerned liens created by carriage of goods where a bill of lading had been issued.[14] The present lien is still by its terms limited to goods covered by a bill of lading although there have been significant changes as to the charges which constitute the lien and those persons against whom it is effective. See 1953 Pennsylvania Bar Association Notes, 12A P.S. § 7–307.

Counsel for plaintiff contends that this section is applicable to the present situation (1) because the defendants have acted under color of this provision and (2) because as to Younger the documents attached as exhibits to West End's counterclaim are bills of lading as defined by the Code.

West End has filed two documents as exhibits accompanying its counterclaim of identical printed form with the word "INVOICE" in bold type below the letterhead. The first document (Doc. #13, Exhibit A) sets forth the towing and storage charges as of July 10, 1973, and the second document (Doc. #23) sets forth towing and storage charges to August 29, 1973. The July 10th invoice is a xerox copy dated "7–10–73" identifying the car as "63 Chev." towed from "3 & 5 Point" to "West End Yard." The charges are itemized as "Tow—15.00, Storage—53.00, Total—68.00" and in the left hand margin is the notation "up to 7–10–73." The blank spaces designated "Name," "Address," "License No.," "Serial No.," "Tow Code," "Dolly," and "Retow" are not filled in. The August 29th document is an original and recites the same information contained in the July 10th invoice except the plaintiff's name and address are recited, tow code is noted as "previous" and there is a notation in the margin "Storage from July 10, 1973 to August 29, 1973. 50 days at $2.00 per day. Previous towing and storage 68.00." West End identifies these documents in their counterclaim as "accounts."

---

14. Act of June 9, 1911, P.L. 838, § 26; 6 P. S. § 76 (repealed 1953) read:

"76. Statement of carrier's lien in bill

"If a negotiable bill is issued the carrier shall have no lien on the goods therein mentioned, except for charges on those goods for freight, storage, demurrage, and terminal charges, and expenses necessary for the preservation of the goods or incident to their transportation subsequent to the date of the bill, unless the bill expressly enumerates other charges for which a lien is claimed. In such case there shall also be a lien for the charges enumerated so far as they are allowed by law and the contract between the consignor and the carrier.

The Uniform Commercial Code in the spirit of elevating substance over form has eliminated the more rigid requirements of the Bills of Lading Act as to the format which a bill of lading must take.[15] Yet the documents which West End has filed do not meet the definition of that more liberal view. Section 1–201(6) defines a bill of lading as ". . . a document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods . . . ." However, West End has not represented either of these documents to be bills of lading issued by it to cover the shipment of the Younger vehicle. Both documents are dated substantially after the date that the vehicle was towed. There is no evidence that either of these documents were issued as an acknowledgement of receipt of the vehicle by West End or that they served in any way as the substantive equivalent of a bill of lading.[16] By plaintiffs' interpretation of § 7–307, a carrier not having complied with the literal terms of this section when he receives the goods may nonetheless create a lien upon them by issuing an invoice after there is a legal dispute over whether the carrier has a statutory lien. This view of § 7–307 renders the phrase "goods covered by a bill of lading" meaningless.

Of course there is no dispute between the parties that the vehicles are in the present possession of defendants, that they were delivered pursuant to the order or instruction of third parties, and that the charges which give rise to the defendants' claims to possession of the vehicles accrue from the towing and storage of the automobiles in question. Nonetheless the requirement of documentation covering the receipt of the goods by defendants as an apparent condition of the lien cannot be ignored as mere surplus. The drafters [17] of the revised Uniform Commercial Code [18] were sufficiently concerned with the importance of this limitation upon the statutory carrier's lien to insert the present language to limit the § 7–307 lien. In the 1953 enactment § 7–307(1) read: "A carrier has a lien on any goods for charges subsequent to the date of its receipt of the goods for storage or transportation . . . ." The revision of this section was a result of a general revision of the entire Code in 1956 prompted by the State of New York Report of the Law Revision Commission to the New York General Assembly recommending certain alterations of the Code

15. Act of June 9, 1911, P.L. 838, § 2 (repealed 1953). This section listed as essential terms in a bill of lading the date of its issue, the name of the person from whom the goods received; the place where the goods were received; the place to which the goods are to be transported; a description of goods; and a statement whether the goods are to be delivered to a specified person, or to order of a specified person.

16. A bill of lading has been described as a document having a threefold character. It is a receipt by the carrier, a contract of carriage between the consignor and the carrier, and a document of title. E. N. Warren, The Historical Background of Article 7 of the Code: The Law of Documents of Title, State of New York, Report of the Law Revision Commission, 1815–1817 (1955).

17. The Uniform Commercial Code was drafted by The American Law Institute in conjunction with the National Conference of Commissioners on Uniform State Laws. Pennsylvania was the first state to adopt the U.C.C., enacting the Code in its entirety on April 6, 1953.

18. In 1952 the U.C.C. was adopted by the American Law Institute and the Conference of Commissioners on Uniform Laws and in 1953 unanimously enacted in Pennsylvania. When the Code was introduced in the New York General Assembly, however, it was referred to the New York Law Revision Commission for further study. Thus the American Law Institute reactivated the U.C.C. editorial board in anticipation of the suggestions and criticisms from the New York Commission. When a final report was made by the Commission to the General Assembly in 1956, the editorial board considered the recommendations and consequently published a revised Code late in 1956. 1958 American Law Institute Proceedings, 47–49. The revised code was enacted in Pennsylvania in 1959.

before its enactment by New York. As part of that revision § 7–307 was amended to make it clear that the lien it provides is a specific lien on the goods covered by a bill of lading as opposed to a general lien on any goods received for transport. Ironically, preliminary drafts of the 1952 official text had provided that carrier's had a lien for charges "subsequent to the date of issue of the bill of lading" but this language was deleted from the final official version of the original Code to remove the implication that the lien was created only in favor of carriers who issue bills of lading.[19] The language of the provision as amended leaves little room to dispute that now only goods covered by a bill of lading are subject to a § 7–307 lien.

Although a carrier has a § 7–307 lien, the lien does not permit him to retain possession as against all others who are entitled to the goods. Subsection (2) of § 7–307 reads:

"A lien for charges and expenses under subsection (1) on goods which the carrier was required by law to receive for transportation is effective against the consignor or any person entitled to the goods unless the carrier had notice that the consignor lacked authority to subject the goods to such charges and expenses. Any other lien under subsection (1) is effective against the consignor and any person who permitted the bailor to have control or possession of the goods unless the carrier had notice that the bailor lacked such authority."

Neither vehicle is alleged to have been towed because the carrier was required to do so by law or was carried out at the instruction of a bailor who was permitted to exercise control over the goods.[20]

Finally, plaintiffs' contention that the defendants acted under color of § 7–307 even though that statute provided no legal authority to assert the liens in question has no serious merit. If the defendants' conduct was not within the terms of the statute, then its constitutionality is not an issue presented by the facts of the present case. Perhaps in a future case a carrier will assert a § 7–307 lien because a bill of lading was issued covering the goods and a person against whom the lien is effective will challenge its constitutionality but that is not the present case. To decide the constitutional question which plaintiffs urge me to resolve would be to give an advisory opinion upon an abstract question of constitutional law which does not arise from the legal controversy before the Court.

This case demonstrates a court's inadequacy, as an institution, to assure a "perfect justice" for all litigants. The consequence of this decision may be that where landowners have used the self-help system of having a car towed away by reason of a car owner's trespassing upon their property, they now do not have a totally adequate remedy if the towing company is not reimbursed as a matter of right under a lien system. But, in contrast, the lien system can cause certain extraordinary abuses. As an example, a person could park by mistake on private property, not knowing that he or she was trespassing, and yet be subjected to extraordinary charges for towing and storage. Here, we decide merely the towing company's common law lien rights, and as the legisla-

19. State of New York, Report of the Law Revision Commission for 1955, Study of the Uniform Commercial Code, 1815–17; State of New York, Report of the Law Revision Commission for 1956, Appendix IV at 445.

20. Shumate claimed that he returned and his car was gone. Younger was present while his automobile was being towed but he al-

leges it was carried out without his request or authority. West End in response to Younger's allegation states in its answer:

"15. Admitted that defendant was ordered by the West Goshen Township police to tow plaintiff's 1963 Chevrolet to his place of business, thereby clearing the intersection where the accident occurred from danger to other motorists."

ture has done in the past, when it concluded that the common law remedies were inadequate, it can explore the type of system which gives a fair measure of protection to both the owners of land and the owners of cars.

Apparently the California Legislature assessed this problem, and found it to be a matter for ultimate correction by the legislature rather than by the judiciary. See n. 13, *supra.*

## CONCLUSION

■ Plaintiffs challenge the constitutionality of Pennsylvania possessory lien procedures under the Fourteenth Amendment due process clause. I find that upon the undisputed facts of record, as a matter of law neither defendant has a possessory lien under common law principles or under the statutes which plaintiffs have brought to the court's attention, and therefore, no issue is presented as to the constitutionality of the procedure by which a lien is asserted or satisfied. Not having established a right to adjudication of the constitutional issue which named plaintiffs purport to raise, their motion for a class determination, their motion for partial summary judgment and their motion for preliminary injunction are denied. Defendants' motions for summary judgment are granted as to plaintiffs' due process claim.

■ Plaintiffs have requested in their summary judgment motion that I exercise pendent jurisdiction over their state tort claim for conversion. In view of my ruling that this case does not even warrant an inquiry into any constitutional issue, it would seem particularly inappropriate to exercise pendent jurisdiction and thus consider the unresolved state tort claim for conversion which plaintiffs ask me to resolve. Accordingly, I will refuse to hear this matter on pendent jurisdictional grounds as to any of the state law issues, provided the de-

fendants waive any defenses which they might have under the statute of limitations or on related grounds. The parties are directed to submit an order as to the pendent jurisdiction claim consistent with this opinion.[21]

---

21. This opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).