Champlain Valley RV Rentals, LLC v. Collision Unlimited, Inc., No. S1035-10 CnC (Toor, J., Feb. 23, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| CHAMPLAIN VALLEY RV RENTALS, LLC<br> Plaintiff<br><br> v.<br><br>COLLISION UNLIMITED, INC.,<br>d/b/a MANY'S AUTOBODY, d/b/a<br>CENTRAL SERVICE TOWING<br> Defendant | Docket No. S1035-10 CnC |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This case began as a replevin action seeking return of a pickup truck and trailer from defendant's custody. Defendant ("Central") filed a counterclaim for payment for towing and recovery services. After the posting of a bond, the vehicles were released to Plaintiff ("Champlain"). The counterclaim was tried to the court on February 10, 2011.

### Findings of Fact

The court finds the following facts established by a preponderance of the evidence. Plaintiff's truck and trailer were involved in some sort of accident on Bolton Flats on July 10, 2010. As a result, the vehicles were damaged and scattered, along with their contents, which included an RV that was on the trailer, across the interstate and median. Defendant, Central Service Towing ("Central") was called by the Vermont State Police to remove the debris from the road. It was creating a hazard to other drivers. It is standard practice for the police to call towing services, and they use a rotating list. The police advised Central that they had a truck towing a trailer in the median and it needed a "pull-back," meaning it needed to be pulled back onto the road.

Central's manager, Craig Jennings, received the call around 2:30 a.m. and dispatched the on-call driver to the site. Jennings then went to the shop to get a medium duty wrecker – a heavier duty tow-truck than what the on-call driver had – to assist, as a truck and a trailer together would likely require that. While on his way to the scene, Jennings was told by phone by the on-call driver, who had already arrived at the scene, that they would need all of Central's trucks and more, given the situation he found there. Jennings thus called in Central's two other trucks.

When Jennings arrived at the scene, he found a trailer upside down with its wheels up, and a truck that had jackknifed up on top of the trailer. The RV camper that had been towed on the trailer was in pieces. Its frame was under the truck on the trailer, but its walls and roof were in the median. Everything from inside the camper – furniture, appliances, etc. – was scattered across the median. There was debris everywhere. Jennings had never in eleven years in the business seen a wreck of this magnitude. Parts of the vehicles were still in the traveled portion of the road. The photos in evidence were taken halfway through the cleanup, and do not fully reflect what the original scene looked like.

When Jennings saw the mess, he called Rick's Towing, another company with whom Central has an agreement for assistance. Rick's sent another tow truck to assist. All in all, there were six people working at the site: four employees of Central, one "sub" borrowed from another company and one employee of Rick's.

The cleanup job took eight hours, from 3:00 a.m. to 11:00 a.m., with all six people (five men and one woman) working. It involved four flatbeds (three of Central's and one of Rick's), a fifteen-ton medium duty wrecker, and a service truck with cleanup

equipment. They had to clean up the site and truck the materials to Central's lot in Williston, taking trips back and forth to do so. They then had to sweep the road clean.

The debris removed from the site was dumped on the ground initially. It was then transferred with a skid steer and an excavator into two thirty-yard dumpsters rented from Gauthier's. The truck and trailer were stored in a secure impound lot. The business was closed until the next day because all the employees were exhausted from working through the night and could not safely be put back on the road.

Jennings and Central's owner did not dispose of the debris in the dumpsters until they were authorized to do so by Champlain, because they do not believe they have the right to dispose of anyone's property without their consent. They were authorized to dispose of the debris by a representative of Peerless Insurance, Champlain's insurer, within a few days of the accident – apparently July 14, although the record was somewhat unclear about the exact date. They were also asked to release the truck, but declined to so without payment in advance. That is their normal practice.

Central billed Champlain $250 an hour per person for the cleanup, for a total of $12,000. They came to that figure based upon the actual cost of the five Central workers, about $20 per hour each, plus what they calculated to be the cost of running the vehicles, plus overhead, plus the cost to Central of paying Rick's Towing for assistance. None of the details of the vehicle operating costs were offered in court. Rick's Towing actually charged Central only $150 an hour for their services, for a total of $1200, plus $300 for the use of their skid steer to fill the dumpsters.

Central also billed Champlain $1,200 for renting the dumpsters (although they only paid Gauthiers $894), storage costs at the rate of $50 a day each for the truck and the

3

camper for eighty days, and storage costs of $50 per dumpster for six days. These are Central's normal storage fees.

When Central responds to police calls like this, it gets paid only about 75% of the time. When a vehicle is not claimed, Central seeks state approval to designate it an abandoned vehicle and then crush it. Central receives about $100 to $200 for such scrap cars.

Central called an expert witness form Anytime Towing, Matthew Norton. He doe similar emergency response work in response to police calls and other calls. He has also had training in "towing and recovery billing." He testified that the $250 an hour rate used by Central is a very reasonable rate, and might even be low for a medium duty truck as opposed to a light duty truck. He also testified that $50 per unit per day for storage is in the middle of the price range for this area. He also agreed that it is improper to throw materials away until authorized to do so, with the exception of things that smell terrible (presumably, things like rotting food). His company also does not release anything from impound until they are paid.

Champlain called an expert witness from North Carolina, Robert Watson. He is a consultant regarding truck accidents, RV accidents, towing and recovery. He owned a towing business in California for twenty-five years, and cleaned up hundreds of accidents like this one. In his opinion, the cleanup rate should be $150 per hour. He based this on a $3 per mile charge, which is what he understands some other towers charge in this area. However, he agreed that different towers charge in different ways, including by the mile or by the hour. He also agreed that different rates are appropriate for different equipment.

4

Watson also testified that he found the time this cleanup took to be unreasonable. He felt it should have been done by four men in four hours, not six men in eight hours. He also felt that the debris in the dumpsters should have been disposed of at the dump immediately rather than saved and stored. He thus calculated a total bill of $4,781, based upon $2,400 for four men for four hours, $1,500 to pay Rick's bill, and $884 for the Gauthiers bill. It is unclear why he felt it fair to pay for the dumpster rental if he did not think the dumpsters were necessary, or for Rick's Towing if he thought four people could have done the job.

## Conclusions of Law

### I. The Towing and Recovery Charges

Both parties agree that they have found no statute in Vermont addressing the rights or obligations of towing companies called by police to clear public highways after an accident. However, Champlain does not dispute that Central has a right to be paid for its towing and cleanup work under a theory of unjust enrichment.[1] It only disputes what is a fair amount.

Unjust enrichment is an equitable doctrine. In evaluating such claims, courts are to consider "whether, in light of the totality of circumstances, it is against equity and good conscience to allow defendant to retain what is sought to be recovered. This involves a realistic determination based on a broad view of the human setting involved, rather than a limited inquiry confined to an isolated transaction." Savage v. Walker, 2009 VT 8, ¶ 8, 185 Vt. 603 (internal quotations omitted).

---

[1] The court agrees. As another court has said, "[t]here is little doubt that defendant at bar rendered a service with respect to the truck [and trailer] in keeping [them] safely" immediately after the accident. Lewis v. Smith, 2 Pa. D. & C.3d 183, 187 (Pa. Com. Pl. 1976).

5

The court concludes that given the nature of the accident, the cleanup work done and the time it took was reasonable. Although based on Mr. Watson's testimony the court gathers that large crashes and messy accident scenes like this are frequent in California, the evidence was that they are rare here. Given the number of cars on the roads in the two states, not to mention the variance in the miles of roads in the two states, the court does not find that surprising. It is, therefore, reasonable that towing companies with less experience in such cleanups would take longer. It may well be that Watson also had heavier-duty equipment at his disposal when he was doing this sort of work. Most importantly, the only parties who actually saw the scene at 3:00 a.m. were Central's employees and Ricks' employee. The photos were taken halfway through the cleanup, and do not fully reflect what the original scene looked like.

The court found Jennings to be a credible witness, and accepts his testimony that his crew worked as fast as they could at the scene. Moreover, given the fact that 25% of the time Central does not get paid for police calls like this, they would have no motive to work slowly to rack up a higher charge. In sum, the court finds the $250 per hour rate and the time spent to be reasonable. The court also finds it reasonable that Central charged more per hour than Rick's, even for Rick's man and vehicle. Central bore the responsibility for managing and completing the project, and was entitled to make a profit on the work.

## II. The Storage Fees

The court finds the $50 per hour storage rate is reasonable, based upon the testimony of Central's expert witness, who was testifying from his personal knowledge about going rates in Vermont. However, the court does not find it reasonable that Central

6

charged Champlain $1,200 for the rental of two dumpsters when it only paid $894 to rent them. Thus, the court will reduce the charge for the dumpster rentals to $894.

The remaining question is whether or not Central had a right to hold the vehicles after their return was demanded on July 14, and thus are entitled to the storage fees for the balance of July, August and September. Champlain argued at the hearing that Central had no right to retain the vehicles until it was paid, and that therefore the storage costs after the request to release the vehicles are invalid. Central has offered no legal basis for such a lien other than "this is the way it's done."

"The right of a garageman to a lien for towing and storage charges has been the subject of considerable litigation[.]" Lien for Towing or Storage, Ordered by Public Officer, of Motor Vehicle, 85 A.L.R. 3d 199, § 2a (1978). Some states have clear statutes creating a lien on such vehicles for the towing and storage charges. *See, e.g*., McKinney's Consolidated Laws of New York, Lien Law, § 184; Mass. General Laws 159B § 6B, Towing Away and Storage of Motor Vehicles.

There appears to be no Vermont statute directly on point. The police are expressly permitted to have stopped vehicles removed from the road. 23 V.S.A. § 1102. However, there appears to be no statute addressing the rights of the car owner and the towing company. The question, then, is whether a common law lien exists that entitles the latter to hold the vehicle until paid.

The Legislature certainly knows how to create a possessory lien for services, as it has done so in other instances. *See, e.g*., 9 V.S.A. § 3904 (possessory lien for self-storage facility fees); 23 V.S.A. § 1213a(f) (in cases where police immobilize a car in connection with a sentence for drunken driving, "[a]ll costs of towing and impoundment shall be

7

paid by the defendant before the vehicle is released to its owner"); 23 V.S.A. § 1753 (municipalities may enact towing ordinances for illegal parking, and "[t]he owner of the motor vehicle may be required to pay reasonable towing and storage charges, as determined by the legislative body of the municipality, for which a lien may be imposed against the motor vehicle"). The fact that it has done so in other contexts suggests that no common law lien was presumed to exist, thus necessitating the statutory provisions. Likewise, the lack of a statutory provision here suggests that there is no right to hold towed vehicles removed from the highway at police request until payment has been made.

"A common-law lien is the right of one person to retain in his or her possession property that belongs to another until certain demands of the person in possession are satisfied or the right to retain possession of certain property until a debt or claim secured by that property is satisfied." 51 Am. Jur. 2d, Liens § 25. For example, "[a] common-law lien exists in favor of the operator of a motor vehicle repair shop or service station for labor and materials or parts supplied or used in repairing a motor vehicle." Id. § 105. "Common-law possessory liens are fundamentally consensual in nature and can be created only by agreement, by some fixed rule of law, or by usage of trade or commerce." Id. § 27.

At first blush it would appear that the practice of towing companies meets the requirement of "usage of trade or commerce." However, the court has found no Vermont case law suggesting that such a lien has existed historically. Nor does the case law from elsewhere support such a conclusion. "At common law, a garageman acquired no lien for towing or storage of a vehicle." Capson v. Superior Court of Ariz., in and for Maricopa

8

County, 677 P. 2d 276, 278 (Ariz. 1984); Candler v. Ash, 372 N. E. 2d 617, 619 (Ohio App. 1976); United Tire and Inv. Co. v. Maxwell, 215 P. 2d 541, 542 (Okl. 1950); Kunde v. Biddle, 353 N.E.2d 410, 413 (Ill. App. 1976); 51 Am. Jur. 2d, Liens § 107 (towing charges do not come within the scope of the common law lien for auto repairs). *See also* State Farm Mut. Auto. Ins. Co. v. Jim Bowe & Sons, Inc., 539 A.2d 391, 394 (Pa.Super.1988)("possessory liens are consensual in nature and must arise from an agreement, either express or implied, between the owner of goods and the bailee who provides some service with regard to the goods."). Thus, "[a]s a general rule, the operator of a garage is not entitled to a lien for charges for storage of a motor vehicle pursuant to the order of a public officer, without the owner's consent, in the absence of a statute authorizing the public officer to store the vehicle and imposing liability on the owner." 38 Am. Jur. 2d Garages, Service Stations and Parking Facilities, § 115 (2010).

The case law in Vermont with regard to common law liens is sparse. However, it suggests that such liens are rare. For example, two cases discuss whether a common law "agister's lien" exists.[2] In an early case involving a dispute over return of a colt that had been pastured on another's land, the Supreme Court held that "[a]n agister had no lien at common law, except by agreement." Nemi v. Todd, 89 Vt. 502, 506 (1915), citing Wills v. Barrister, 36 Vt. 220, 224 (1863) ("the law gives no lien on the cow for the agisting thereof"). The problem was apparently remedied by legislation in 1884. Nemi, 89 Vt. at 506.

The common law liens to which the Vermont cases refer are as follows: "The common law recognized the right of inn-keepers, carriers and certain artisans and

---

[2] An agister, for those unfamiliar with the term, is defined as "one who takes and pastures grazing animals for a fee." Black's Law Dictionary, 8th Ed. (2004).

9

mechanics to hold a lien upon property delivered to them for their charges. Inn-keepers and carriers had such lien upon the theory that they were bound to serve all persons who required their services; and artisans upon the theory that by their labor and skill the specific property bailed to them had been increased in value." Quimby v. Hazen, 54 Vt. 132, 138 (1881). In distinguishing these liens from the lien sought on the cow, the Court in Wills noted that the cases "establish only that factors, bailees for hire, carriers and inn-keepers, artizans and mechanics, have a lien on the property entrusted to them for expenditures or charges in respect thereto, or for work expended thereon, and this for reasons peculiar to such classes of persons -- none of which reasons exist as to the agistors of cattle." 36 Vt. at 224-25. *See also*, Ruggles v. Walker, 34 Vt. 468, 470 (1861) ("where a party has, in the way of his trade or occupation, bestowed his money, labor, or skill upon a chattel, in the *alteration and improvement* of its properties, or for the purpose of *imparting an additional value* to it, he has a lien upon it for a fair and reasonable remuneration.")(emphasis added). In other words, it is the work done on the property, increasing its value, that creates the lien -- not the mere storage or caretaking of property. Capson, 677 P. 2d at 278 (common law lien arose "only when some value was imparted to the automobile by 'performing work or furnishing material' for the vehicle"). *Compare* Chase v. Robinson, 86 Vt. 240, 243 (1912) (a trainer of horses had a lien for the training).

Our Supreme Court has also held that a person charging another for storage of personal property has no lien upon the property unless he comes within the terms of the statute creating a warehouse lien. Hackel v. Burroughs, 117 Vt. 328, 332 (1952). The person providing storage in Hackel therefore "did not have a lien upon the property for

the unpaid balance due for storage and was under a duty to return the property upon demand." Id.

Thus, there is nothing to suggest that Vermont recognizes a common law lien for vehicles towed without the owner's consent. This is consistent with the decisions of courts in numerous other jurisdictions, which have found that "[a]lthough police have the power to remove disabled vehicles from highways, they may not create a lien upon a vehicle without the owner's consent." Navistar Financial Corp. v. Allen's Corner Garage and Towing Service, Inc., 505 N.E. 2d 1321, 1324 (Ill. App. 2d Dist. 1987); Younger v. Plunkett, 395 F. Supp. 702, 710 (E.D. Pa. 1975) (although police can remove a vehicle from the highway, "absent a statutory authorization, police are not thereby empowered to create a lien upon the vehicle in favor of a private towing company which is effective against the vehicle owner without his consent."); Alabama Farm Bureau Mut. Cas. Co. v. Lyle Service Ambulance-Wrecker, 395 So. 2d 90, 93 (Ala. Civ. App. 1981) ("It has been held generally that a common law lien is not applicable to towage and storage charges on an automobile"). *See also*, Halloran v. Spillane's Servicecenter Inc., 587 A. 2d 176, 182 (Conn. Super. 1990) ("in other jurisdictions, courts have uniformly held that a towing company acquires no lien on a vehicle" that has been towed because it was parked on someone else's property).[3]

In the absence of any Vermont cases suggesting that a common law lien exists here, this court also concludes that no lien exists. Although Central had a right to charge for towing and storage, "in the absence of some common law or statutory lien authorizing

---

[3] One court has held that a garageman has a lien for a car towed at the request of police because "[a]s part of the privilege of driving a vehicle in this state, a licensed driver impliedly agrees to allow a peace officer to have his vehicle towed and stored when the . . . vehicle becomes immobilized." Bray v. Curtis, 544 S.W. 2d 816, 818 (Tex. Civ. App. 1976). However, Texas had a statutory lien for garagemen, so the issue before the court was merely whether the towing created implied consent such that the statute applied.

it to retain possession of the property until its charges were paid, appellant was obliged to restore the property to its owner when demand was made for its return . . . , and there was no right to charge for storage of the property beyond that date." T.R. Ltd. v. Lee, 465 A.2d 1186, 1190 (Md. App. 1983).

Thus, Central has the right to be paid for its towing and recovery services, and for the storage prior to the time Champlain sought release of the vehicles, but did not have the right to hold the vehicles after a demand for their release was made. Because the storage fees that accrued after the date of the demand arose only because of Central's refusal to release the vehicles, Central is not entitled to those additional fees. As in Hackel, Central "did not have a lien upon the property for the unpaid balance due for storage and was under a duty to return the property upon demand." 117 Vt. at 332.

The court therefore will subtract the storage fees after July 15 from the amounts due to Central.[4]

Order

The court awards Central $12,000 for towing and recovery costs, $894 for the dumpster rental, and $1,200 for storage fees ($600 for the dumpsters and $600 for the vehicles), for a total of $14,094. Central is ordered to submit a proposed judgment within ten days, to which Champlain shall have five days to object pursuant to V.R.C. P. 58(d). Dated at Burlington this 23rd day of February, 2011.

_____
Helen M. Toor
Superior Court Judge

---

[4] The court selects July 15 because it is unclear at what time of day on the 14th the request for release was made, and because the court presumes some time would have been needed to arrange for removal the vehicles.